**2015 UT App 53**

THE UTAH COURT OF APPEALS

STATE OF UTAH,
Plaintiff and Appellee,
*v.*
DALE R. BECKERING,
Defendant and Appellant.

Opinion
No. 20120157-CA
Filed March 5, 2015

Third District Court, Salt Lake Department
The Honorable Robert P. Faust
No. 111902541

Ronald Fujino, Attorney for Appellant

Sean D. Reyes and Deborah L. Bulkeley, Attorneys
for Appellee

JUDGE JOHN A. PEARCE authored this Opinion, in which JUDGES
J. FREDERIC VOROS JR. and MICHELE M. CHRISTIANSEN concurred.

PEARCE, Judge:

¶1 Dale R. Beckering appeals his aggravated abuse of a vulnerable adult conviction, which was enhanced to a second degree felony because the jury found he had acted in concert with others. Beckering argues that his trial counsel rendered ineffective assistance by inviting errors in the jury instructions and by failing to object to several instances of alleged prosecutorial misconduct and improper testimony. He also argues that the district court's failure to prevent the prosecutorial misconduct and improper testimony constituted plain error. We affirm.

BACKGROUND

¶2      On March 25, 2011, a 22-year-old female (Victim) was found dead in Beckering's house. Victim had resided in the house as the ward of Cassandra Shepard, Beckering's stepdaughter. Victim suffered from fetal alcohol syndrome and functioned at a child-like level. Shepard had been appointed as Victim's guardian. Shepard managed Victim's behavior by allowing her to earn "privileges" that Shepard would revoke for bad behavior.

¶3      In February 2010, Shepard sent Victim from South Dakota to Utah to live with Beckering and his wife—Shepard's mother Sherrie Beckering (Wife)—in their one-bedroom apartment in West Valley City. During this period, Wife usually cared for Victim, but Beckering would tend to her when Wife was working.

¶4      In July 2010, Victim knocked on one of Beckering's neighbor's doors and reported that she "was being abused and she had escaped." The neighbor had never seen Victim before and was surprised when Victim said she lived in Beckering's apartment. Victim was wearing ragged clothes and showed the neighbor bruises on her wrists, forearms, and upper chest. The neighbor spent the day with Victim and allowed her to make several phone calls. Although it is unclear who summoned them, police eventually arrived at the apartment complex. The neighbor told the officers about the reported abuse and directed them to Victim. The officers spoke with Victim and indicated they were going to take her to a psychiatric facility.

¶5      A week or two later, Victim returned to the neighbor's apartment and reported that Beckering had instructed Victim to apologize. The neighbor saw Victim only once more, when Victim was taking out the garbage. Victim's hair was buzzed on one side. She explained that one of the women in the apartment had shaved her head as punishment. Victim also reported that she was given only one cup of rice and a glass of water per day and that she was forced to take pills to make her sleep.

¶6      In September 2010, Victim moved back to South Dakota to live with Shepard. After about a month, however, Shepard and Victim returned to the West Valley City apartment. Victim's daughter and Shepard's two daughters also moved into Beckering's apartment at that time. Shepard and the girls slept in the living room of the apartment. Victim slept in the laundry room.

¶7      Upon her return to Beckering's apartment, Victim was having health problems, including sores that failed to heal and trouble toileting herself. She also found it increasingly difficult to earn new privileges and began to lose existing ones. After she lost her television privilege, she was required to stay in the laundry room so she could not see the television. Eventually, Victim was forced to stay in the laundry room most of the time. Shepard put an alarm on the laundry room door to prevent Victim from escaping.

¶8      In December 2010, a couple who lived in the building across from Beckering's began noticing Victim standing alone on the balcony of Beckering's apartment. Although it was cold, Victim would be on the balcony clad only in a t-shirt and shorts or pants. They sometimes saw Victim eating or drinking out of a coffee can; whatever was in the can made Victim gag. Other times, they saw Victim inside the storage closet on the balcony. They could see Beckering's living room through the balcony's sliding door. They sometimes observed Beckering using a computer while Victim was outside.

¶9      Eventually, a neighbor called the police after observing Victim on the balcony, "kind of crying and just looking down at me, wanting help." The neighbor knew that Beckering was home when the police responded because she saw him on the balcony while officers were in the apartment. Shepard told the police that Victim was on the balcony "per doctor's orders" to reduce swelling in her feet. Thereafter, the neighbors continued to see Victim on the balcony, but she was dressed more warmly.

¶10    In early January 2011, Beckering and the other residents of the West Valley City apartment moved to a house in Kearns. Everyone slept in bedrooms at the Kearns house except Victim, who had lost the privilege of having a room and was forced to sleep in a coat closet. The closet door was fitted with an alarm and kept shut by a shelf or other object placed in front of the door. Although Victim knew "to stay quiet," the girls could sometimes hear her whining.

¶11    Victim usually stayed in the closet. She was not permitted to sit at the dinner table and had lost the privilege of playing with the girls. Shortly before Victim's death, one of the girls saw Victim being bound and placed in the closet. The girl also witnessed Shepard put tape across Victim's mouth.

¶12    On March 25, 2011, police and medical personnel responded to a 911 call reporting a "possible overdose" at the Kearns home. When they arrived, they discovered Victim lying dead on the living room floor. Shepard was attempting to revive Victim. Officers observed that Victim's hands and forearms were wrapped so tightly with bandages that she would not have been able to use her fingers or thumbs. Both of her eyes were bloodshot. Officers found a red pepper flake under her right eyelid. Victim was wearing a "very soaked" toddler-sized diaper and had wounds on her ankles that matched cut zip ties found near her body.

¶13    In the closet where Victim had slept, police found zip ties attached to the clothing rod such that a person could be bound with outstretched arms. Cardboard on the floor appeared to be stained with blood, urine, and feces. Scented pine cones and baking soda had been placed in the closet in an apparent attempt to mask the resulting odor. Outside the closet, a metal shelf had been mounted on the wall next to the door. The shelf held a Lysol bottle, deodorizer, duct tape, and a saucepan containing a steak knife, pepper seeds, and nylon zip ties, two of which were cut. On the wall of the closet, there was "a fairly large drawing of a suffering Jesus with the thorns on his head."

¶14    A post-mortem examination of Victim revealed redness caused by contact dermatitis, possibly the result of exposure to a chemical spray, on her face and inside her mouth. She had a bruise on her forehead and bruises on her left hip and right leg consistent with having been struck by an object. Ulcers had formed underneath the bandages on her hands, which had not healed because the bandages were wrapped tightly. Toxicology testing revealed a toxic and possibly fatal dose of antihistamine—nine times the therapeutic level—in Victim's system. Victim was also severely dehydrated. The medical examiner ruled Victim's death a homicide caused by physical abuse and neglect.

¶15    Police arrested Beckering, Shepard, and Wife. Beckering submitted to a police interview, wherein he consistently denied any knowledge of Victim's abuse. Although he initially denied any role in Victim's care, he eventually admitted that he sometimes cared for Victim at the West Valley City apartment. He claimed that he kept his distance from Victim because she had falsely accused him of rape and he was afraid that she would do so again. Beckering told police that he and Wife lived primarily in the basement of the Kearns home, that he worked twelve-hour shifts, and that when he returned home from work he might see Victim "for five seconds" before going downstairs.

¶16    Beckering admitted that he knew of the bandages on Victim's hands, but he told police that he believed Shepard's explanation that the bandages were designed to prevent Victim from harming herself. He also told police that he knew Shepard had placed an alarm on the closet door but that "he didn't ask why." Beckering knew that Shepard would not allow Victim to eat dinner with the family, and when Shepard would shuttle food into the living room to feed Victim, he could hear Shepard shouting and "telling [Victim] to eat it, swallow it, and don't throw it up."

¶17    The State charged Beckering with being a party to the intentional or knowing aggravated abuse of a vulnerable adult, a second degree felony subject to an in-concert enhancement to a first

degree felony. Beckering's defense at trial was that he did not know about Victim's abuse and that he had no duty to act to protect her. Beckering did not testify at trial. The jury convicted Beckering of the lesser-included offense of being a party to reckless aggravated abuse of a vulnerable adult, enhanced to a second-degree felony because it was committed in concert with others. The district court sentenced Beckering to one to fifteen years in prison.

ISSUES AND STANDARDS OF REVIEW

¶18    Beckering, represented by new counsel on appeal, contends that his trial counsel rendered ineffective assistance by inviting errors in the jury instructions and by failing to object to several instances of prosecutorial misconduct and improper testimony. "When a claim of ineffective assistance of counsel is raised for the first time on appeal, there is no lower court ruling to review and 'we must decide whether [the] defendant was deprived of the effective assistance of counsel as a matter of law.'" *Layton City v. Carr*, 2014 UT App 227, ¶ 6, 336 P.3d 587 (alteration in original) (quoting *State v. Tennyson*, 850 P.2d 461, 466 (Utah Ct. App. 1993)).

¶19    Beckering also argues that the district court committed plain error by failing to intervene in the alleged prosecutorial misconduct. "The plain error standard of review requires an appellant to show the existence of a harmful error that should have been obvious to the district court." *State v. Waterfield*, 2014 UT App 67, ¶ 18, 322 P.3d 1194; *see also State v. Dunn*, 850 P.2d 1201, 1208–09 (Utah 1993) (discussing plain error).

ANALYSIS

I. Jury Instructions

¶20    Beckering identifies several alleged errors in the jury instructions. He did not object to the jury instructions at trial, and

the alleged errors are therefore not subject to ordinary appellate review. *See State v. Low*, 2008 UT 58, ¶ 17, 192 P.3d 867 ("'Where there is no clear or specific objection . . . the theory cannot be raised on appeal.'" (quoting *State v. Johnson*, 2006 UT App 3, ¶ 13, 129 P.3d 282)). Further, Beckering concedes that his counsel invited the alleged errors by approving the jury instructions, thereby precluding review for plain error. *See State v. Lee*, 2014 UT App 4, ¶ 20, 318 P.3d 1164 ("[I]nvited error precludes appellate review of an issue under the plain error standard."); *State v. Alfatlawi*, 2006 UT App 511, ¶ 26, 153 P.3d 804 ("A defendant invites error where he affirmatively approve[s] of the jury instructions at trial." (alteration in original) (citation and internal quotation marks omitted)). Because the alleged errors in the jury instructions are both unpreserved and invited, Beckering argues that his trial counsel provided ineffective assistance by failing to ensure that the jury instructions were correct.

¶21    To succeed on an ineffective assistance of counsel claim, Beckering must show "both 'that counsel's performance was deficient' and 'that the deficient performance prejudiced the defense.'" *Layton City v. Carr*, 2014 UT App 227, ¶ 12, 336 P.3d 587 (quoting *Strickland v. Washington*, 466 U.S. 668, 687 (1984)). Counsel's performance will not be deemed deficient unless a defendant can "show that counsel's representation fell below an objective standard of reasonableness." *Id.* (citation and internal quotation marks omitted). There is a "strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." *Id.* (citation and internal quotation marks omitted). "To establish the prejudice element of an ineffective assistance of counsel claim, the defendant must show that a reasonable probability exists that, but for counsel's error, the result would have been different." *Id.* (citation and internal quotation marks omitted).

¶22    Beckering first complains that his counsel should have ensured that the elements instructions made clear that each of several terms in those instructions—including "party to the

offense," "vulnerable adult," and "caretaker"—was a separate factual determination that the State needed to prove and the jury needed to decide. Beckering argues that the elements instructions "were too conclusory and they incorrectly presented [the terms] as a 'given' rather than let the jury decide such facts for themselves." For example, the instructions on aggravated abuse of a vulnerable adult asked the jury to find, in part, that Beckering "cause[d] a vulnerable adult to suffer serious physical injury." By Beckering's reading, this language "concluded that a 'vulnerable adult' did in fact exist even though such a finding should have been made by the jury."

¶23    "The general rule for jury instructions is that an accurate instruction upon the basic elements of an offense is essential." *State v. Bird*, 2015 UT 7, ¶ 14 (citation and internal quotation marks omitted). "To determine if jury instructions correctly state the law, we 'look at the jury instructions in their entirety and will affirm when the instructions taken as a whole fairly instruct the jury on the law applicable to the case.'" *State v. Painter*, 2014 UT App 272, ¶ 6, 339 P.3d 107 (quoting *State v. Maestas*, 2012 UT 46, ¶ 148, 299 P.3d 892); *cf. State v. Stringham*, 2001 UT App 13, ¶ 17, 17 P.3d 1153 ("Failure to give requested jury instructions constitutes reversible error only if their omission tends to mislead the jury to the prejudice of the complaining party or insufficiently or erroneously advises the jury on the law." (citation and internal quotation marks omitted)).

¶24    "We generally presume that a jury will follow the instructions given it." *State v. Menzies*, 889 P.2d 393, 401 (Utah 1994). When a single element in a criminal-elements instruction contains multiple factual determinations, the element implicitly requires the jury to resolve each of those factual determinations in favor of the State in order to convict. To use the example Beckering advances, the element asking the jury to determine whether he "cause[d] a vulnerable adult to suffer serious physical injury" required the jury to make at least three subsidiary factual determinations: (1) that Beckering caused an injury, (2) that the

injury was a serious physical injury, and (3) that the injured person was a vulnerable adult.[1] We presume the jury did so, *see Menzies*, 889 P.2d at 401, and we are not convinced that the organization of the instructions "misle[d] the jury" or "insufficiently or erroneously advise[d] the jury on the law," *see Stringham*, 2001 UT App 13, ¶ 17 (citation and internal quotation marks omitted).

¶25    Beckering also provides this court with no authority for his proposition that a defendant is entitled to, and that his counsel provides ineffective assistance by failing to secure, instructions that present each discrete factual inquiry as a separate element of an offense. Instead, Beckering compares this case to *Alleyne v. United States*, 133 S. Ct. 2151 (2013). In *Alleyne*, a jury convicted the defendant, finding that he had "'[u]sed or carried a firearm during and in relation to a crime of violence.'" *Id.* at 2156 (alteration in original). However, the trial court imposed a statutorily enhanced mandatory minimum sentence based on the court's own determination that the defendant had brandished the firearm. *Id.* The Supreme Court reversed the conviction, holding that because the finding of brandishing increased the defendant's sentence, that determination "was an element, which had to be found by the jury beyond a reasonable doubt." *Id.* at 2163.

¶26    The *Alleyne* decision primarily addressed sentencing enhancement factors, abrogating a prior distinction "between facts that increase the statutory maximum and facts that increase only the mandatory minimum." *Id.* at 2155. In doing so, it applied and confirmed the pre-existing general rule that "each element of a crime [must] be proved to the jury beyond a reasonable doubt." *Id.* at 2156. Beckering points to nothing in *Alleyne* that suggests that

---

1. The jury's fact-finding role in this regard was further emphasized by separate instructions providing definitions of terms including "vulnerable adult" and "caretaker."

elements must be presented to a jury in any particular form.[2] The only aspect of *Alleyne* that appears to apply to this case is the general requirement that elements of crimes be decided by a jury—a requirement that was satisfied here.

¶27 We see no deficient performance by counsel in allowing the elements instructions to present multiple factual determinations within individual elements, because "the instructions taken as a whole fairly instruct the jury on the law applicable to the case." *Painter*, 2014 UT App 272, ¶ 6 (citation and internal quotation marks omitted). Furthermore, even if counsel had acted unreasonably by failing to seek to limit each element to a single factual question, Beckering has not demonstrated prejudice, because the instructions given still required the jury to resolve each individual factual determination in the State's favor to find that the State had proven the elements as a whole. Absent a showing of prejudice, Beckering has not established ineffective assistance of counsel relating to this aspect of the jury instructions.

¶28 Beckering next argues that his trial counsel performed ineffectively by allowing the elements instructions to include language asking the jury to determine whether he acted "as a party to the offense, including as a caretaker." Beckering argues that because a "party to the offense" and a "caretaker" are two different and unrelated concepts, the language used in the elements instructions created "both uncertainties and inconsistencies in determining whether the jury had factually found that [Beckering] was a 'caretaker' or a 'party to the offense.'" Beckering argues that his trial counsel's acquiescence to the instructions' wording constituted ineffective assistance.

---

2. We note that in *Alleyne v. United States*, 133 S. Ct. 2151 (2013), the Supreme Court expressed no discomfort with the verdict form the jury used to find that the defendant had "'[u]sed or carried a firearm during and in relation to a crime of violence,'" notwithstanding the multiple factual determinations contained in that single finding. *Id.* at 2156 (alteration in original).

¶29    To obtain relief based on ineffective assistance of counsel, Beckering must demonstrate prejudice, i.e., a reasonable probability that but for counsel's errors, the result would have been different. *Strickland v. Washington*, 466 U.S. 668, 687 (1984). "In the event it is 'easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice,' we will do so without analyzing whether counsel's performance was professionally unreasonable." *Archuleta v. Galetka*, 2011 UT 73, ¶ 41, 267 P.3d 232 (quoting *Strickland*, 466 U.S. at 697). Here, we proceed directly to the prejudice prong of Beckering's ineffective assistance claim.

¶30    Beckering argues that, due to the nature of the alleged jury instruction error, we should either presume prejudice or require the State to establish lack of prejudice. However, none of the cases that Beckering cites in support of this argument arose in the context of an ineffective assistance of counsel claim. *See Alleyne v. United States*, 133 S. Ct. 2151 (2013); *Neder v. United States*, 527 U.S. 1 (1999); *Chapman v. California*, 386 U.S. 18 (1967); *State v. O'Bannon*, 2012 UT App 71, 274 P.3d 992; *State v. Pearson*, 1999 UT App 220, 985 P.2d 919. "To show prejudice in the ineffective assistance of counsel context, the defendant bears the burden of proving that counsel's errors actually had an adverse effect on the defense and that there is a reasonable probability that, but for counsel's errors, the result of the proceeding would have been different." *State v. Munguia*, 2011 UT 5, ¶ 30, 253 P.3d 1082 (citation and internal quotation marks omitted); *see also State v. Cruz*, 2005 UT 45, ¶ 18, 122 P.3d 543.

¶31    Beckering fails to articulate a persuasive explanation of how removing or altering the language "as a party to the offense, including as a caretaker" from the elements instructions could reasonably have led to a more favorable result for him at trial. Beckering argues that "being a 'party to the offense' was not the same as being a 'caretaker,'" but he ignores the instructions' use of the word "including" as a bridge between the two seemingly unrelated terms. The entire phrase "as a party to the offense, including as a caretaker" can reasonably be read to mean simply "as a party to the offense," with the language "including as a

caretaker" included to remind the jury that caretaker status would not preclude conviction so long as the other elements of the offense were satisfied.[3] If other plausible readings of the language exist, Beckering neither identifies them nor explains their relevance to the prejudice analysis.

¶32    Beckering has failed to show prejudice arising from the inclusion of the language "as a party to the offense, including as a caretaker" in the elements instructions. Accordingly, he has failed to carry the heavy burden of establishing an ineffective assistance of counsel claim. *See State v. Lenkart*, 2011 UT 27, ¶ 25, 262 P.3d 1. We therefore reject his ineffective assistance of counsel claim relating to the challenged language.

---

3. This reading of the challenged language is consistent with the language and structure of Utah Code section 76-5-111, which defines the crime of aggravated abuse of a vulnerable adult and provides for two separate theories of criminal liability. *See* Utah Code Ann. § 76-5-111(2) (LexisNexis 2012). Section 76-5-111(2) provides for criminal penalties against "any person, including a caretaker," who causes serious physical injury to a vulnerable adult under circumstances likely to produce death or serious physical injury. *See id.* Section 76-5-111(2) also provides for criminal liability for a person who, "having the care or custody of a vulnerable adult, causes or permits" the vulnerable adult to be injured or placed in a situation where her person or health is endangered. *See id.* The statutory language "including a caretaker" appears to be intended to clarify that, while only a caretaker can be liable for "caus[ing] or permit[ting]" the harm identified in the second theory of liability, "*any* person, *including a caretaker*" can be liable under the first theory by "caus[ing] a vulnerable adult to suffer serious physical injury." *See id.* (emphasis added). The State charged Beckering under both theories of liability and, like the statute, the elements instructions at his trial clarified that only the "causes or permits" theory required a jury finding that Beckering was Victim's caretaker.

¶33    Beckering also argues that his trial counsel permitted the jury instructions to incorporate two mental states into the same charged offense. Beckering argues that the elements instruction for reckless aggravated abuse of a vulnerable adult required the jury to find that he acted both recklessly and intentionally.[4]

¶34    Beckering contends that the reckless aggravated abuse instruction "improperly tasked the jury to find both (1) that Mr. Beckering was a 'party to the offense' (which required an intentional mental state), and (2) 'that the defendant did so recklessly' (which required a reckless mental state)." He also argues that the instruction failed to adequately link the different mental states to the individual elements to which they applied. He further argues that, due to the conflicting mental standards, "the crime, as decided by the jury, is a legal impossibility."

¶35    We do not address these arguments on their merits because they allege errors that were invited below. Instead, Beckering must demonstrate that trial counsel's failure to correct the alleged errors constituted ineffective assistance of counsel. To do so, Beckering must establish both deficient performance by counsel and resulting prejudice. *See Strickland v. Washington*, 466 U.S. 668, 687 (1984). However, his brief does not address either the objective reasonableness of counsel's failure to object to the instructions or the likelihood of a different result for Beckering had counsel objected. We will not conduct that analysis on Beckering's behalf. *See State v. Robison*, 2006 UT 65, ¶ 21, 147 P.3d 448 (noting that the appellant bears the burden of persuasion on appeal and that an appellate court will not "do the heavy lifting" for the appellant).

---

4. The jury received a separate instruction defining the concept of "party to the offense" or "accomplice" liability. That instruction stated, among other things, that Beckering could not be convicted as an accomplice unless he had "the intent that the underlying crime be committed," he "intended to aid the principal actor(s) in the offense," and he "intentionally aid[ed] in the commission of the crime."

¶36 We note, however, that the instruction's inclusion of both recklessness and party-to-the-offense concepts does not appear to present any inherent error. Utah courts have concluded that accomplice—i.e., "party to the offense"—liability can attach to offenses requiring a reckless mental state. In *State v. Jeffs*, 2010 UT 49, 243 P.3d 1250, the Utah Supreme Court explained that "intent" as used in the accomplice liability context "is a legal term of art that means '[t]he state of mind accompanying an act.' It should not be confused with the mental state designated as 'intentionally.'" *Id.* ¶ 43 (alteration in original) (citation omitted). Rather, "accomplice liability adheres only when the accused acts with the mens rea to commit the principal offense." *Id.* (citation and internal quotation marks omitted); *see also State v. Briggs*, 2008 UT 75, ¶ 14, 197 P.3d 628 ("[I]t is not necessary for the accomplice to have the same intent that the principal actor possessed as long as the accomplice intended that an offense be committed."); *State v. Binkerd*, 2013 UT App 216, ¶¶ 24–29, 310 P.3d 755. Reading the jury instructions in light of *Jeffs*, the elements instruction properly informed the jury that it could convict Beckering of aggravated abuse of a vulnerable adult if it found that Beckering had acted with the "intent" of recklessness. *See Jeffs*, 2010 UT 49, ¶ 43.

¶37 Beckering has not shown deficient performance of trial counsel or resulting prejudice relating to the elements instruction's inclusion of both "reckless" and "party to the offense." He has therefore not established ineffective assistance of counsel arising from the instruction's use of those terms.

## II. Prosecutorial Misconduct

¶38 Beckering also contends that the State's prosecutorial misconduct entitles him to a new trial. Beckering argues the State solicited "inappropriate witness opinion, together with other improperly admitted evidence," from the detective who interviewed Beckering after Victim's death. Beckering's counsel did not object to this testimony, and Beckering raises the issue as an ineffective assistance of counsel claim. Beckering also argues that

the district court's failure to intervene to prevent or strike the testimony constitutes plain error. *See State v. Dunn*, 850 P.2d 1201, 1208 (Utah 1993) (explaining that the doctrine of plain error requires an appellant to show that an error exists, that the error should have been obvious to the trial court, and that the error is harmful).

¶39 During its direct examination of the detective who interviewed Beckering, the State elicited testimony that the detective did not believe that Beckering could have been unaware of the abuse occurring in his house. Beckering identifies some seven questions and answers that he deems objectionable. For example, Beckering points to the following exchange:

> Q: At this point, did you again confront the defendant, so to speak, with the actual conditions that [Victim] was living in, and how it was possible [Beckering] may not have known it, and . . . what kind of information you gave to him to confront him with that statement?

> A: Basically towards the end of the interview, admittedly I'm getting frustrated with how somebody can live in a home, a small home, and not hear or see things that are going on in the home or be aware of it or have questions about what's going on in your own home, and I go over the autopsy, what we found, the conditions of the zip ties in the closet, that sort of thing, and you know, how somebody could not be aware of what's going on, and basically again he just, you know, he doesn't go upstairs, he doesn't do anything to interact with her, has basically no clue about what's going on in the home in regards to [Victim]. The information he was getting was coming from [Wife] and [Shepard].

The detective expressed his "frustration" with Beckering's answers at least five times, as well as stating, "[M]y belief was, I was having a hard time understanding how somebody could not know that that was happening in the home, being in that close proximity." At least twice, the detective characterized Victim's treatment as torture, stating that "basically she's been tortured in the closet" and expressing his belief that "when somebody's being tortured to the amount that [Victim] was being tortured, . . . everybody in that home would've known."

¶40 Beckering raises numerous legal theories to explain how these questions and answers implicate plain error and ineffective assistance of counsel. He argues that the State repeatedly and improperly elicited the detective's opinion and feelings about whether Beckering was telling the truth. *See State v. Burk*, 839 P.2d 880, 883 (Utah Ct. App. 1992) ("Evidence is unfairly prejudicial[] if it has a tendency to influence the outcome of the trial by improper means, . . . or otherwise causes a jury to base its decision on something other than the established propositions of the case." (citation and internal quotation marks omitted)). He argues that the State's questions asked the detective to "comment on the veracity" of Beckering's statement, *see State v. Davis*, 2013 UT App 228, ¶ 38, 311 P.3d 538, and that the answers constituted improper expert testimony about Beckering's credibility, *see State v. Perea*, 2013 UT 68, ¶ 40, 322 P.3d 624. He also argues that the answers constituted improper expert testimony about Beckering's "mental state." *See* Utah R. Evid. 704.

¶41 Beckering's authorities are distinguishable from the instant case. For example, *State v. Davis*, 2013 UT App 228, 311 P.3d 538, held that a prosecutor asking a defendant whether another witness "was lying" was inappropriate because "[s]uch a question is argumentative and seeks information beyond the defendant's competence." *Id.* ¶¶ 37–38. Here, the State did not ask the detective whether he believed Beckering was telling the truth during the interview.

¶42    The detective's testimony also does not resemble that in cases where courts have found that an expert improperly testified as to a witness's veracity. For example, in *State v. Nelson*, 777 P.2d 479 (Utah 1989), the Utah Supreme Court reversed a conviction after a family therapist opined that the victim "was telling the truth at the time [the therapist] interviewed him." *Id.* at 481. Similarly, *State v. Van Matre*, 777 P.2d 459 (Utah 1989), reversed the conviction of a defendant convicted after an expert testified that children who describe sexual conduct "'are usually telling the truth'" and that "'[c]hildren typically don't lie.'" *Id.* at 461 (alteration in original).

¶43    Here, the detective's testimony never directly asserted that Beckering was lying during the interview. Nor did the detective testify that he could detect dishonesty or that Beckering was being dishonest. Instead, the detective, as part of describing the interview, commented on why he continued to ask Beckering about the abuse despite Beckering's repeated denials. Beckering also fails to identify any way in which the State took undue advantage of the allegedly objectionable aspects of the detective's testimony to argue for his conviction.[5]

¶44    Beckering also argues that the detective's multiple uses of the word "tortured" constituted improper "comments meant to inflame passion or prejudice in the jury." *See Boyle v. Christensen*, 2011 UT 20, ¶ 18, 251 P.3d 810. In *Boyle*, the Utah Supreme Court concluded that defense counsel's reference to "the McDonald's coffee case" in front of a civil jury was improper because it "would seem to have the sole purpose of recalling the public outrage over isolated elements of the [McDonald's] case—thus improperly

---

5. For example, it would likely have been improper for the State to suggest to the jury that the detective's experience made him an excellent judge of credibility and that if he did not believe Beckering then the jury should not believe him either. But Beckering points us to no such explicit improper use of the detective's testimony.

appealing to a jury's passions." *Id.* ¶ 22. In this case, we are not convinced that the isolated references to torture had the "sole purpose" of creating outrage or "improperly appealing to [the] jury's passions." *See id.*

¶45   However, even assuming impropriety in the detective's questioning and testimony, Beckering cannot establish either ineffective assistance of counsel or plain error if there was a conceivable strategic reason for Beckering's counsel to allow the questioning without challenge. The Utah Supreme Court has instructed that "if the challenged act or omission might be considered sound trial strategy, we will not find that it demonstrates inadequacy of counsel." *State v. Dunn*, 850 P.2d 1201, 1225 (Utah 1993). Similarly, "[p]lain error does not exist when a conceivable strategic purpose exists to support the use of the evidence." *State v. Bedell*, 2014 UT 1, ¶ 26, 322 P.3d 697 (citation and internal quotation marks omitted). The district court "should take measures to avoid interfering with potential legal strategy or creating an impression of a lack of neutrality." *Id.*

¶46   There were conceivable strategic reasons for Beckering's counsel to let the detective's testimony proceed without objection. The detective's testimony afforded Beckering the opportunity to present his side of the story to the jury without taking the witness stand and subjecting himself to cross-examination. It was reasonable trial strategy to allow the detective to describe his multiple expressions of frustration and disbelief so that the jury could hear Beckering's repeated and strenuous denials in the face of strong questioning.

¶47   Similarly, there were justifiable reasons for trial counsel not to object to the detective's description of Victim's treatment as torture. Objecting to the isolated references could have been viewed by the jury as an attempt to minimize Victim's suffering. It was sound trial strategy not to contest the State's characterization of the abuse but to ask the jury to blame that abuse entirely on Wife and Shepard.

¶48    In combination, both aspects of the detective's testimony played into Beckering's ultimate trial strategy, which was to acknowledge the severity of Victim's treatment while asking the jury to focus on the evidence presented at trial and find that Beckering did not know about the abuse. Indeed, Beckering's counsel referred to both aspects of the detective's testimony in his closing argument, stating,

> [The detective testified,] "I don't believe him. You have to know what's going on in your house." Time after time after time, parents don't know that their teenagers are cutting school and hanging out in the house. Time after time after time, they don't know their teenagers are having sex, doing drugs.
>
>     . . . .
>
>     . . . . [T]he real question is, did he know that he had to do something? You heard from the evidence that from December to March, he didn't want anything to do with her. He stayed away from her. Because he was scared of her. He was afraid of the problems. It's as he said to the officers, when he found out—when they said, she's been tortured.
>
> She's been tortured?
>
> Yes, and that's putting it mildly.
>
> Oh my God, were his words. He said, I wish I would've gone up there more. Because maybe he could've done something about it.

Thus, Beckering's counsel actually made use of both the detective's statements of disbelief and the references to torture in arguing for Beckering's acquittal.

¶49    Because counsel's decision to refrain from objecting to the State's examination of the detective could be considered a reasonable trial strategy, that lack of objection cannot support a claim of ineffective assistance of counsel. *See State v. Lee*, 2014 UT App 4, ¶ 17, 318 P.3d 1164. For the same reason, the district court did not commit plain error by refusing to intervene in the State's questioning. *See Bedell*, 2014 UT 1, ¶ 26 ("A district court is not required to constantly survey or second-guess [a] nonobjecting party's best interests or trial strategy and is not expected to intervene in the proceedings unless the evidence would serve no conceivable strategic purpose." (alteration in original) (citation and internal quotation marks omitted)).

CONCLUSION

¶50    Beckering has failed to demonstrate that he received ineffective assistance of counsel at trial. He has also failed to establish that the alleged prosecutorial misconduct and improper testimony constituted plain error. We therefore affirm his conviction of aggravated abuse of a vulnerable adult.

———————————