2021 UT App 22

## THE UTAH COURT OF APPEALS

STATE OF UTAH,
Appellee,
*v.*
NICHOLAS PATRICK SEACH,
Appellant.

Opinion
No. 20190457-CA
Filed March 4, 2021

Third District Court, West Jordan Department
The Honorable L. Douglas Hogan
No. 181400824

Sarah J. Carlquist, Attorney for Appellant

Sean D. Reyes and Jonathan S. Bauer,
Attorneys for Appellee

JUDGE RYAN M. HARRIS authored this Opinion, in which
JUDGES MICHELE M. CHRISTIANSEN FORSTER and
DAVID N. MORTENSEN concurred.

HARRIS, Judge:

¶1    Nicholas Patrick Seach appeals three of his four convictions for aggravated assault, which stem from his interactions with a family of four at a public park. On appeal, Seach raises a claim of ineffective assistance of counsel, asserting that his trial attorney performed deficiently by not lodging an objection to certain aspects of the jury instructions, and that this prejudiced him with respect to three of the charges. We find Seach's arguments unpersuasive, and therefore affirm his convictions.

BACKGROUND[1]

¶2     One day, a family (consisting of Father, Mother, a teenage Son, and a teenage Daughter) drove their pickup truck to a public park to recreate. Mother and Daughter went on a run, and Son and Father stayed near the truck while Father tinkered with and rode his bicycle. Some time later, Father saw a man—who turned out to be Seach—walking "back and forth" on the sidewalk. When Father approached, Seach began cursing at Father. Father did not respond to Seach's exclamations, and decided it might be best to leave the park to avoid further interactions with Seach. Father then went to find Mother and Daughter, and Son remained inside the truck. While Father was gone, Son watched from inside as Seach spit on the truck's door handles. When Father returned to the truck with Mother and Daughter, he noticed the spit on the door handles, and at that point, Mother called the police. Seach was still close by and, while Mother was on the phone, Seach approached the family and told them that they "needed to go away" and "leave." Mother responded by telling Seach that she was phoning the police and that the family did not "want to have any problems with [him] or with anybody."

¶3     As Mother was conversing with Seach, Son became angry because he perceived that Seach "was yelling at [his] mom," so he "got out of the truck . . . and[] started cussing" at Seach. Mother testified that, at that point, Seach threatened to kill the family, and looked like "he wanted to hit" Son. After a while,

---

1. "On appeal, we recite the facts from the record in the light most favorable to the jury's verdict and present conflicting evidence only as necessary to understand issues raised on appeal." *Layton City v. Carr*, 2014 UT App 227, ¶ 2 n.2, 336 P.3d 587 (quotation simplified).

Seach walked over to his car. "By then [the family] could hear the police" sirens and thought Seach would leave.

¶4     Instead, Seach returned to the area near the family's truck, walking with "one hand in front of him and one hand behind" his back. Father testified that Seach "had a gun" in his front hand and "had a knife" in his back hand. The family, meanwhile, had no weapons with them; indeed, Father testified that he "never use[s] weapons" and does not "like them." As Seach approached the family, he continued to state "that he was going to kill" them. Mother testified that Seach "had his gun in his hand," and that he "went like this towards all of us," making a gesture in which she "pointed her hand back and forth across her body." Mother then "rushed [Son and Daughter] into the back of the truck" from the passenger side, while Father attempted to get into the driver's seat. Seach then walked over to the driver's side of the truck, held the gun to "the back part of [Father's] head," and "stopped [Father] from closing the door."

¶5     By this point, Mother and Daughter were "crying and screaming," Son "panicked," and all three of them became "hysterical." Eventually, Father was able to close the truck door, at which point Seach started shooting at the truck. Seach's gun—although it appeared to be a real handgun—turned out to be a pellet gun, and Seach's shots hit but therefore did not penetrate the truck's windows. After firing the gun multiple times, Seach "took off" in his car.

¶6     At least two officers were dispatched to the park in response to Mother's initial 911 call, and they were given Mother's description of Seach's vehicle. The primary responding officer (Officer) saw a car matching the description, and "initiated a traffic stop on that vehicle." Seach was in the car. Officer and a second officer "performed a high-risk stop" because the dispatcher had "relayed . . . that a firearm had been brandished and that the caller had been threatened with that

firearm." After initiating the stop, Officer placed Seach under arrest without incident, and gave him a chance to explain what had "happened at the park." Seach, who is white, willingly responded that he "felt threatened by" the family members, who are Latino, and offered his perception that "there were Mexican cartel members at the park." Seach told Officer that he thought the family had weapons, but upon further questioning he admitted that he had "not actually see[n] any weapons." Seach also disclosed "that he did not have a gun on him but that there was a toy gun in his car." Officer then conducted a search of Seach's vehicle and recovered a realistic-looking, revolver-style "air soft" or "pellet gun" that was "loaded." Officer did not recover a knife from the car.

¶7     Officers also met the family at the park, and took statements from them about what had just occurred. Officer examined the family's truck and observed two "pockmarks in the windshield" of the vehicle that were "consistent with" marks that could have been made by a pellet gun. Officer "also observed saliva on the door" of the truck.

¶8     The State charged Seach with four counts of third-degree-felony aggravated assault, one for each member of the family. Seach pleaded not guilty to all counts, and the case proceeded to a two-day jury trial. The State called Father, Mother, Son, and Officer as witnesses, each of whom testified about the events as outlined above.

¶9     After the State rested its case, Seach testified in his own defense, claiming that he felt "uncomfortable" after seeing Father "riding [a] little pedal bike" around the parking lot and "directly behind [Seach's] car more than once." Seach stated that he "almost felt like [he] was being stalked in a way," and that Father's actions made him feel like he was "getting creeped on." Seach testified that he became nervous and thought he "possibly heard my name being called," so he asked Father "if he knew

who I was" and told Father to "back off bitch and back off my car." Seach admitted to spitting on the family's truck, claiming that he did so because Father was "spotting me or whatever his business was in the park." After telling Father to back off, Seach claimed that Mother then yelled at him and Son approached him as if he were going to "windmill [Seach] with his fists," and verbally threatened to "kill [Seach] with a razor blade." Seach admitted to "agging it on" by "get[ting] into a fighting stance" and stated that, at that time, he held a "cooking utensil" in his hand. Seach testified that, eventually, he retreated to his car to grab his pellet gun after he saw the family "making a move." He claimed to have thought that his "life was in danger" because the family might have been going into the truck "to get a weapon to come at" him. When asked why he thought this, Seach stated that his fear "was based on the fact that there [was] . . . an older Hispanic on a pedal bike," which he found "suspicious," and was based on his "perception" that Father might be "a construction worker" and thus carry tools in his truck that could be used as weapons. Seach then admitted to "popping off rounds onto the windshield" of the truck, and to pointing the gun at Father, but denied pointing the gun at anyone else and denied touching Father directly with the gun. He claimed that he had acted at all times in self-defense, intending merely to deploy a "scare tactic" against the family, and that he had no "intention to hurt them." On cross-examination, Seach admitted that his "intention [was] to frighten them" with his "realistic looking pistol." On recross and redirect, Seach further clarified that he "wanted them to think that [he] could" kill them to discourage the family members from retrieving any weapons that they might have in their truck.

¶10    After both sides rested, the court instructed the jury. Because the sole issue presented on appeal has to do with certain of the jury instructions, we set forth those instructions here in some detail, and note that none of the relevant instructions drew

an objection from Seach at trial. Instruction 26 stated, in relevant part, as follows:

> A person cannot be found guilty of a criminal offense unless that person's conduct is prohibited by law, AND at the time the conduct occurred, the defendant demonstrated a particular mental state specified by law.
>
> . . . .
>
> As to the "mental state" requirement, the prosecution must prove that at the time the defendant acted (or failed to act), he did so with a particular mental state. For each offense, the law defines what kind of mental state the defendant had to have, if any. For some crimes the defendant must have acted "intentionally" or "knowingly." For other crimes, it is enough that the defendant acted "recklessly," with "criminal negligence," or with some other specified mental state.
>
> Later I will instruct you on the specific conduct and mental state that the prosecution must prove before the defendant can be found guilty of the crime(s) charged.

¶11 Instruction 28 informed the jury that "[e]very offense not involving strict liability shall require a culpable mental state, and when the definition of the offense does not specify a culpable mental state and the offense does not involve strict liability, intent, knowledge, or recklessness shall suffice to establish criminal responsibility." Instructions 29 through 34 provided definitions of "intentionally," "knowingly," and "recklessly."

¶12 The jury instructions also included four separate "elements" instructions—Instructions 39 through 42—one for

each charged count of aggravated assault. These four instructions were identical except for the name of the alleged victim; we set out Instruction 39 here in its entirety:

> Before you can convict the defendant of aggravated assault as charged in count 1 of the information, you must find from the evidence, beyond a reasonable doubt, each of the following elements:
>
> 1. On or about February 17, 2018;
>
> 2. In Salt Lake County;
>
> 3. The defendant, NICHOLAS PATRICK SEACH, did:
>
>> a. Attempt with unlawful force or violence to do bodily injury to [Father]; or
>>
>> b. Threaten, accompanied by a show of immediate force or violence, to do bodily injury to [Father]; or
>>
>> c. Commit an act, with unlawful force or violence, that caused bodily injury to [Father] or created a substantial risk of bodily injury to [Father];
>
> 4. And in so doing the defendant used a dangerous weapon.
>
> If, after careful consideration of all the evidence in this case, you are convinced, beyond a reasonable doubt, that the State has proven each one of the foregoing elements, then you must find the defendant GUILTY. However, if you are not convinced beyond a reasonable doubt of any one or more of the foregoing elements, then you must find the defendant NOT GUILTY.

¶13   After hearing the evidence and deliberating, the jury returned a verdict convicting Seach on all four counts.

ISSUE AND STANDARD OF REVIEW

¶14   Seach now appeals three of his four convictions: the ones for which the jury determined that he assaulted Mother, Son, and Daughter.[2] In so doing, Seach raises a single issue for our consideration: whether his trial counsel was constitutionally ineffective for failing to object to certain portions of the jury instructions regarding the required mental state for aggravated assault. "A claim of ineffective assistance of counsel raised for the first time on appeal presents a question of law, which we consider de novo." *State v. King*, 2018 UT App 190, ¶ 11, 437 P.3d 425 (quotation simplified).

ANALYSIS

¶15   A defendant seeking to demonstrate that his attorney rendered ineffective assistance must make a two-part showing: that (1) the attorney's performance was deficient, and (2) this "deficient performance prejudiced the defense" by giving rise to "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland v. Washington*, 466 U.S. 668, 687, 694 (1984). The first prong of this analysis involves an assessment of the objective reasonableness of counsel's actions, *see State v. Scott*, 2020 UT 13,

———————————

2. Seach does not appeal his conviction for aggravated assault against Father, acknowledging in his brief that, even if counsel had performed deficiently by failing to object to certain jury instructions, any shortcomings in counsel's performance did not prejudice him with regard to the count involving Father.

¶ 35, 462 P.3d 350, and "requires the defendant to show 'that counsel made errors so serious that counsel was not functioning as the counsel guaranteed the defendant by the Sixth Amendment,'" *State v. Grunwald*, 2020 UT 40, ¶ 19, 478 P.3d 1 (quoting *Strickland*, 466 U.S. at 687). "And the second prong requires the defendant to show that 'counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable.'" *Id.* (quoting *Strickland*, 466 U.S. at 687). With regard to this second prong, the crucial question is whether "the outcome of [the defendant's] case would have been different absent counsel's error." *Scott*, 2020 UT 13, ¶ 43.

¶16 But in cases where a defendant claims that the attorney rendered ineffective assistance by failing to object to jury instructions, there is a threshold question whose answer will inform the two-step *Strickland* analysis: in such cases "we must first consider whether [the jury] instructions [at issue] were legally correct." *State v. Liti*, 2015 UT App 186, ¶ 12, 355 P.3d 1078. This is because "[f]ailure to object to jury instructions that correctly state the law is not deficient performance," *State v. Vigil*, 2019 UT App 131, ¶ 11, 448 P.3d 738 (quotation simplified), and cannot, by definition, lead to prejudice, *see State v. Von Niederhausern*, 2018 UT App 149, ¶¶ 29–30, 427 P.3d 1277 (holding that, "where [a] [d]efendant fails to identify, let alone argue, what would have been the legally correct version of the instruction," the "[d]efendant also fails to show prejudice since an objection to the jury instructions would have surely been unsuccessful"). Accordingly, we first assess the correctness of the jury instructions Seach challenges.

A

¶17 When examining jury instructions to assess their correctness, we review them "in their entirety to determine whether the instructions, taken as a whole, fairly instructed the jury about the applicable law." *Liti*, 2015 UT App 186, ¶ 12. The

logical place to begin our analysis is with the statute defining the offense with which Seach was charged. *See id.* ¶ 13.

¶18    Aggravated assault is statutorily defined as:

> (i) an attempt, with unlawful force or violence, to do bodily injury to another;
>
> (ii) a threat, accompanied by a show of immediate force or violence, to do bodily injury to another; or
>
> (iii) an act, committed with unlawful force or violence, that causes bodily injury to another or creates a substantial risk of bodily injury to another; and

> (b) that includes the use of:

> (i) a dangerous weapon . . . .

Utah Code Ann. § 76-5-103(1) (LexisNexis 2017). Although the aggravated assault statute does not specify a particular mental state, or mens rea,[3] that the State must prove to establish criminal liability, *see id.*, a separate statute provides that, where the offense in question "does not involve strict liability," and does not otherwise specify the level of mens rea required, then proving the defendant's "intent, knowledge, or recklessness shall suffice to establish criminal responsibility," *id.* § 76-2-102. Aggravated assault is not a strict liability offense. *See id.* § 76-5-

---

3. "Mens rea is '[t]he state of mind that the prosecution, to secure a conviction, must prove that a defendant had when committing a crime,' and 'is the second of two essential elements of every crime at common law, the other being the actus reus.'" *State v. Gallegos*, 2020 UT App 162, ¶ 32 n.4 (quoting *Mens Rea*, Black's Law Dictionary (11th ed. 2019)), *petition for cert. filed*, Feb. 10, 2021 (No. 20210092); *see also infra* note 5.

103(1). Therefore, because the aggravated assault statute does not otherwise specify the required mens rea, the State was required to prove that Seach acted intentionally, knowingly, or recklessly. *See id.* §§ 76-2-102, -5-103(1).

¶19    Seach correctly observes that a legally accurate set of jury instructions in a criminal case will include an instruction regarding the level of mens rea that the State must prove in order to secure a conviction. *See State v. Bird*, 2015 UT 7, ¶ 14, 345 P.3d 1141 (stating that, as a "general rule," an "accurate instruction upon the basic elements of an offense is essential," and that "mens rea . . . is an essential element of an offense" (quotation simplified)). Seach asserts that the set of instructions given in this case lacked clear direction regarding the applicable mens rea. And after reviewing the instructions, we think Seach makes a good point.

¶20    The elements instructions given in this case (Instructions 39–42) do not contain any guidance as to the applicable mens rea.[4] The State acknowledges this, but correctly points out in response that mens rea guidance need not necessarily be provided in the elements instruction (although it often is), as long as it is provided elsewhere in the entire set of instructions.

---

4. We note (as does Seach) that the suggested Model Utah Jury Instruction setting forth the elements of aggravated assault *does* include guidance regarding the applicable mens rea, and provides that a defendant must have "intentionally, knowingly, or recklessly" committed the crime. *See* Model Utah Jury Instructions 2d, CR1320 (Adv. Committee on the Model Utah Criminal Jury Instructions 2019), https://www.utcourts.gov/resources/muji/inc_list.asp?action=showRule&id=41#1320 [https://perma.cc/ZVP8-NAY7]. The elements instructions given in this case, by contrast, did not include those four words.

*See State v. Beckering*, 2015 UT App 53, ¶ 23, 346 P.3d 672 (stating that "we look at the jury instructions in their entirety and will affirm when the instructions taken as a whole fairly instruct the jury on the law applicable to the case" (quotation simplified)); *see also State v. Plexico*, 2016 UT App 118, ¶ 31, 376 P.3d 1080 (concluding that a set of jury instructions was not erroneous "[e]ven though the elements instruction did not articulate the culpable mental state," because the proper mens rea guidance could be found in a separate instruction). The State asserts that, in this case, sufficient mens rea guidance was provided in Instructions 26 and 28–34. We acknowledge the State's argument, and can even imagine that law-trained readers—and perhaps even some lay readers—of the complete set of instructions might be able to infer that the applicable mens rea in this case is "intentionally, knowingly, or recklessly." But in our view, this set of instructions was not quite as clear as it should have been about the applicable level of mens rea.

¶21 Instructions 26 and 28 contain some discussion of mens rea, but they do not completely solve the problem, because those instructions never expressly state that aggravated assault is not a strict liability offense, or that "intentionally, knowingly, or recklessly" is the required mens rea for aggravated assault. Indeed, Instruction 26 tells the jury that it will "[l]ater" be instructed "on the specific conduct and mental state that the prosecution must prove before the defendant can be found guilty," but express instructions on that point never came. To be sure, the jury was immediately thereafter given five instructions (Nos. 29–34) that define "intentionally," "knowingly," and "recklessly," and the jury was never given any instructions defining "strict liability" or "criminal negligence" (the other two potentially applicable levels of mens rea); from these instructions, and from the fact that the only levels of mens rea actually defined in the instructions are intent, knowledge, and recklessness, one might be able to infer that those levels are the

only ones applicable. But at most, this is an inference that might be drawn by a keen-eyed reader. The instructions do not expressly state as much, and never actually tell the jury that assault is not a strict liability offense, nor do they ever actually instruct the jury that, to find Seach guilty, it must find beyond a reasonable doubt that he acted intentionally, knowingly, or recklessly. And we consider this at least potentially problematic. *See Bird*, 2015 UT 7, ¶ 16 (stating that an instruction is "[o]f particular concern" when it "leaves the erroneous impression that a crime is one of strict liability, when it in fact contains a mens rea element").

¶22    Accordingly, we agree with Seach that the set of instructions given to the jury in this case was infirm, and not completely accurate.

B

¶23    After finding infirmity in the jury instructions, we next proceed to assess Seach's claim of ineffective assistance of counsel under the two-prong *Strickland* framework. *See State v. Liti*, 2015 UT App 186, ¶¶ 12, 18, 355 P.3d 1078. In order to prevail, Seach must make a showing sufficient to satisfy both parts of the test. *See State v. Delgado*, 2020 UT App 121, ¶ 25, 473 P.3d 234. Therefore, "[i]t is unnecessary to address both components of the inquiry if we determine that [Seach] has made an insufficient showing on one." *See id.* (quotation simplified). In the discussion that follows, we largely confine our analysis to the prejudice prong. We do so because Seach has not carried his burden of demonstrating that, even if his attorney had timely objected and the trial court had given the jury a set of instructions expressly stating that Seach must have acted with intent, knowledge, or recklessness, it would have made a difference under the facts of this case. *See State v. Roberts*, 2019 UT App 9, ¶ 23, 438 P.3d 885 ("In practice, we often skip the

question of deficient performance when a defendant cannot show prejudice.").

¶24 "When applying *Strickland*'s prejudice analysis in the context of erroneous jury instructions, we must determine whether there is a reasonable probability the jury would not have convicted the defendant if the jury instructions had been correct." *State v. Grunwald*, 2020 UT 40, ¶ 22, 478 P.3d 1. "A reasonable probability is a probability sufficient to undermine our confidence in the outcome." *Id.* (quotation simplified). This determination hinges on the following questions: "(1) did the error in the jury instructions create the possibility that the jury convicted the defendant based on factual findings that would not have led to conviction had the instructions been correct? and, (2) if so, is there a *reasonable probability* that at least one juror based its verdict on those factual findings?" *Id.*

¶25 We turn, then, to the question of whether the issues with the jury instructions, on the facts of this case, created a "reasonable probability" that at least one juror voted to convict Seach "based on factual findings that would not have led to conviction had the instructions been correct." *See id.* As noted above, to convict Seach of all four counts, the State had to prove beyond a reasonable doubt that Seach committed aggravated assault against each family member, and that he did so intentionally, knowingly, or recklessly. *See* Utah Code Ann. §§ 76-2-102, -5-103(1). While it might be possible, in some cases, for a defendant to be wrongfully convicted of aggravated assault because of the precise lack-of-mens-rea-instruction problem found in this set of jury instructions, we do not think such a result was reasonably probable on the facts of this case.

¶26 Here, Seach never claimed that his actions were not purposeful, or that his actions were accidental or merely negligent; instead, his entire defense to the charges was

built around a claim that he acted purposefully, out of self-defense, with the stated intention to frighten members of the family, even going so far as to say that he "wanted them to think that [he] could" kill them. He readily acknowledged retrieving a gun from his car, and admitted not only that he intentionally pointed the gun at members of the family, but also that he intentionally fired the gun in the direction of the family's truck. Neither party presented evidence to the jury that the shooting was an accident, or that Seach's actions were merely the result of negligence. And no argument was made, from either side, that the jury should convict Seach on strict liability grounds. This case is therefore unlike the facts of *State v. Liti* because, although counsel in that case centered the defense around a claim of self-defense, the defendant's "own testimony was that the shooting was an accident." *See* 2015 UT App 186, ¶ 20, 355 P.3d 1078. In a situation like that, where evidence was presented indicating that the defendant's actions could have been accidental, omitting from the jury instructions the requirement that the defendant must act with intent, knowledge, or recklessness might have mattered. *See id.* ¶ 23. But here, where no such evidence or argument was presented, even by Seach, there exists no possibility—let alone a reasonable probability—that the jury mistakenly convicted Seach under an erroneous understanding that aggravated assault can occur through negligent behavior or under a strict liability theory.

¶27 Seach resists this conclusion by attempting to parse out his actions with respect to each family member, and by asserting that he "did not act with the necessary intent with respect to Mother and Daughter" at all, and that any threatening actions he took toward Son "occurred before Seach retreated to his car and retrieved the pellet gun." But even this argument contains no contention that any of

Seach's actions, at any point, were merely accidental or negligent.

¶28    Indeed, Seach's argument applies more to actus reus[5] than it does to mens rea. The question Seach posits here is whether, as a factual matter, he pointed the gun at one family member or at all of them, not whether his action in waving the gun—at whomever he waved it—was accidental or purposeful. The jury convicted Seach of assaulting all four family members, and Seach does not challenge the jury's finding—through an insufficiency-of-the-evidence argument or other means—that he committed this conduct. After all, Mother testified that Seach pointed the gun at all of them. So the relevant question, as concerns this appeal, is not whether Seach committed acts that could constitute assault against all four family members—the jury found that he did, and that actus reus finding is here unchallenged—but, rather, what Seach's state of mind was when he committed those acts. And there was no dispute about that, because Seach told the jury what his state of mind was when he took those actions: it was to intentionally frighten members of the family.[6] Under these facts, Seach's argument that he

---

5. Actus reus is "[t]he wrongful deed that comprises the physical components of a crime and that generally must be coupled with mens rea to establish criminal liability; a forbidden act." *Actus Reus*, Black's Law Dictionary (11th ed. 2019); *accord State v. Tillman*, 750 P.2d 546, 565 (Utah 1987) (noting that "actus reus" is synonymous with the "conduct proscribed in the definition of the offense").

6. Seach's testimony established that he was acting intentionally toward Father and at least one other family member; he testified that it was his "intention to frighten *them*." (Emphasis added.) One plausible reading of the record, espoused by the State, is

(continued…)

purposefully waved the gun and shot the gun at Father, but did not wave it or point it at anybody else, misses the mark.

¶29 The circumstances presented here leave no possibility, let alone a "reasonable probability," *see Grunwald*, 2020 UT 40, ¶ 22, that any juror voted to convict Seach based on a misunderstanding that he could be convicted under a strict liability theory or for acting negligently. Accordingly, Seach has not carried his burden of demonstrating that he was prejudiced by his trial counsel's failure to object to the jury instructions. Thus, we end our analysis here, without conclusively analyzing the deficient performance element.[7]

_____

(…continued)

that Seach—by using the word "them"—was referring to the entire family. Seach asserts that this reference was only to Father and Son, but we have our doubts about the plausibility of Seach's interpretation. This interpretive debate is ultimately academic, however, because Seach's actions toward Mother and Daughter were at least reckless. Purposefully waving, and then firing, a gun in the general direction of four persons located together, even if the threat is only intended to be directed to one or two of those persons, constitutes at least reckless behavior as concerns the others. *See, e.g., State Farm Fire & Cas. Co. v. Torio*, 673 N.Y.S.2d 696, 697 (N.Y. App. Div. 1998) (holding that a person's "criminal act of firing 18 shots in the direction of a group of people, inflicting five wounds, cannot be considered an accident," even if the gun was pointed "down low" with no "inten[t] to actually hit anyone with gunfire").

7. With regard to deficient performance, the central question is whether counsel's actions "fell below an objective standard of reasonableness." *State v. Scott*, 2020 UT 13, ¶ 31, 462 P.3d 350 (quotation simplified). It seems to us that, given the state of the

(continued…)

CONCLUSION

¶30 The instructions given to the jury in this case were incomplete with regard to mens rea. But because Seach admitted at trial that his actions were purposeful, and made no argument that they were accidental, there is no possibility that he was improperly convicted by jurors operating under a mistaken belief that he could be convicted of aggravated assault for mere negligent behavior or under a strict liability theory. Consequently, any failure on the part of Seach's trial counsel to object to the jury instructions did not prejudice Seach because there is not a reasonable probability that it would have made a difference to the outcome of the trial. For these reasons, Seach's ineffective assistance claim fails, and we affirm his convictions.

———————

(…continued)

evidence presented to the jury in this case, a reasonable attorney might have declined to spend time worrying about the jury instructions' lack of precision regarding mens rea. *See State v. Ray*, 2020 UT 12, ¶ 32, 469 P.3d 871 (stating that defense attorneys are entitled to "pick [their] battles" and that appellate courts must "view a decision to not object in context and determine whether correcting the error was sufficiently important under the circumstances that failure to do so was objectively unreasonable"). Thus, for the same reasons Seach's prejudice argument fails, his deficient performance argument would have faced tough sledding.