**2025 UT App 138**

# THE UTAH COURT OF APPEALS

STATE OF UTAH,
Appellee,
*v.*
KITIONA LOLANI,
Appellant.

Opinion
No. 20220790-CA
Filed September 25, 2025

Third District Court, Salt Lake Department
The Honorable Randall N. Skanchy
No. 181908923

Dain Smoland and Staci Visser,
Attorneys for Appellant

Derek E. Brown and Emily Sopp,
Attorneys for Appellee

JUDGE DAVID N. MORTENSEN authored this Opinion, in which
JUDGES GREGORY K. ORME and RYAN M. HARRIS concurred.

MORTENSEN, Judge:

¶1      Kitiona Lolani viciously struck Dylan[1] in the head and neck
more than twenty times over the span of thirty seconds. Dylan
was then taken to the hospital and pronounced dead, and Lolani
was charged with and convicted of murder. On appeal, Lolani
claims ineffective assistance of counsel, arguing that his trial
counsel (Counsel) was ineffective in failing to object to a faulty
jury instruction. While the jury instruction was incorrect as a
matter of law, we need not decide whether Counsel's failure to

_____

1. A pseudonym.

object constituted deficient performance because Lolani was not prejudiced by the failure. We therefore affirm Lolani's conviction.

## BACKGROUND[2]

*The Fight*

¶2 In the summer of 2018, Lolani and Dylan were inmates at the Salt Lake County Jail. One day in early August, the two men got into an argument during a card game. Dylan challenged Lolani to "go outside" and fight, but Lolani ignored him.

¶3 The next day, Lolani and Dylan had a few more exchanges. Dylan taunted Lolani, asking him if he "want[ed] to take on the champ" and telling him that he was a "bitch, just like [his] mom." For his part, Lolani kicked Dylan's chair while the inmates were watching a movie and said, "[F]uck you, bitch." Lolani also told Dylan that he was "going to get [him]" and "fuck [him] up."

¶4 Lolani spoke with his wife (Wife) about the dispute on the telephone. He told Wife that he "went at it with somebody today," "almost" fought that person, and would "fucking break [that person's] fucking face." Lolani also told Wife that he had "been wanting to swing on" Dylan and "whoop his ass." He mentioned that he was trying—but failing—to calm down. When Wife asked Lolani not to fight Dylan, Lolani responded that he was "sorry" and that he loved her "a lot." He nonetheless also said that he "might end up staying [in custody] longer . . . because [he] might break some part of [Dylan's] bones."

¶5 Lolani also spoke with a fellow inmate about the matter. The inmate recommended that Lolani give up his job as a

---

2. "On appeal from a jury verdict, we recite the facts in the light most favorable to that verdict." *State v. Fullerton*, 2018 UT 49, ¶ 4 n.1, 428 P.3d 1052 (cleaned up).

"trustee,"[3] which would have resulted in his transfer to another jail section. Lolani asked an officer to be removed as a trustee, but he did not explain why. The officer told Lolani to "think about it."

¶6     The next day, Lolani was helping serve breakfast to the other inmates as part of his trustee duties. Dylan picked up his breakfast tray, walked over to Lolani, and appeared to exchange words with him. After the brief exchange, Lolani punched Dylan in the face and knocked him to the floor. He then delivered about twenty more blows to Dylan's head and neck in approximately thirty seconds. Dylan did not appear to be fighting back. In fact, according to one witness, Lolani was "[b]eating" Dylan "so bad that [the] punches were knocking him out and waking him up one after the other to the point where [other] inmates . . . were telling [Lolani], '[T]hat's enough, that's enough.'" A deputy (Deputy) yelled at Lolani to stop and used pepper spray on him. Once Dylan "stopped moving," Lolani stood up, put his hands behind his back, and told Deputy to "cuff him up." He also said that Dylan had "messed with the wrong guy."

¶7     Other officers arrived to find Dylan bleeding and making "gurgling noises," and they began administering CPR. Dylan was taken to the hospital, where he was pronounced dead. A medical examiner (Examiner) conducted an autopsy and concluded that Dylan died due to a "vertebral artery tear," which was caused by blunt-force trauma.[4] Examiner ruled the death a homicide, and Lolani was charged with murder.

---

3. Trustees assist the deputies with various tasks, including preparing meals. In return, they receive certain benefits.

4. At trial, Examiner testified that blunt-force trauma alone was not sufficient to cause the tear and suggested that Dylan had to have been struck at a specific spot from a specific angle for the tear

(continued…)

*The Trial*

¶8      At trial, the State introduced, among other evidence, a video recording of the incident and audio recordings of Lolani's various phone conversations with Wife. The State also called multiple witnesses, including Deputy and Examiner, to testify about the incident and surrounding events.

¶9      Additionally, the State called a witness (Bouncer) whom Lolani had assaulted years before the incident. Bouncer testified that he had been working as a bouncer at a bar when Lolani broke the orbital bone in his face in four places with a single punch, causing a concussion and traumatic brain injury. Lolani pled guilty to aggravated assault in connection with the encounter.[5]

_____

to have occurred. However, he also stated what seems to be the obvious: that "head trauma" and "head injuries" can cause death even when they don't cause vertebral artery tearing.

5. Before trial, the State filed a notice under rule 404(b) of the Utah Rules of Evidence of its intent to call Bouncer to testify about the previous encounter. Lolani objected, and the district court sustained the objection. The State filed another rule 404(b) notice after Lolani pled guilty to assaulting Bouncer. Over Lolani's renewed objection, the court allowed Bouncer to testify about the assault. The court concluded that evidence of the assault was proper to show Lolani's intent when he attacked Dylan, finding that "[s]omebody with the ability to do serious bodily injury with one punch, two punch[es], or 24 punches to an individual, certainly has the . . . idea associated with what the intent of his pummeling of somebody would be." The court alternatively concluded that evidence of the assault was admissible to prove lack of mistake or accident. Lolani does not challenge the district court's decision to admit the rule 404(b) evidence.

¶10 The prosecutor told the jury it could convict Lolani of murder under any one of three theories: (1) Lolani intended to cause or knowingly caused Dylan's death, (2) Lolani intended to cause serious bodily injury to Dylan and committed an act clearly dangerous to human life that caused Dylan's death, or (3) Lolani, acting under circumstances evidencing a depraved indifference to human life, knowingly engaged in conduct that created a grave risk of death to another and thereby caused Dylan's death. *See* Utah Code § 76-5-203(2)(a)–(c). The prosecutor also argued that the case was decidedly not one of homicide by assault—a lesser included offense to murder—because that crime occurs "where you just don't expect" the victim to die. As an example, the prosecutor described a scenario in which "[a] teenage soccer player punches a [referee] one time and the referee dies."[6]

¶11 Lolani elected not to testify. Counsel conceded that Lolani caused Dylan's death and focused instead on sowing the seeds of reasonable doubt about whether he *intended* to kill Dylan. To this end, Counsel stressed how rarely a fistfight results in death.[7] The

---

6. The prosecutor may have been referring to the April 2013 incident in which a single punch from a seventeen-year-old soccer player caused a referee to lapse into a coma and die. *See* Mike Prindiville, *Utah Soccer Referee Dies After Teen Punches Him in the Face*, NBC Sports, https://www.nbcsports.com/soccer/news/utah-soccer-referee-dies-after-teen-punches-him-in-the-face [https://perma.cc/3PCJ-V5M4].

7. Indeed, Examiner testified that he had previously never seen a case in which a fistfight caused a vertebral artery tear. Describing the incident in this case as a "fistfight" would seem to be a mischaracterization, however, given its one-sided nature: Lolani landed at least twenty blows, and Dylan didn't even appear to throw a punch.

defense ultimately asked the jury to convict Lolani of homicide by assault instead of murder.

¶12    Lolani requested, and received, a jury instruction on homicide by assault. He proposed the following language:

> Homicide by Assault has been submitted as a lesser included charge stemming from on or about August 4, 2018. You cannot convict the defendant of this offense unless, based on the evidence, you find beyond a reasonable doubt each of the following elements:
>
> 1. [Lolani]
>
> 2. caused the death of another
>
> 3. while intentionally or knowingly attempting, with unlawful force or violence, to do bodily injury to another.
>
> After you carefully consider all the evidence in this case, if you are convinced that each and every element has been proven beyond a reasonable doubt, then you must find the defendant GUILTY. On the other hand, if you are not convinced that each and every element has been proven beyond a reasonable doubt, then you must find the defendant NOT GUILTY.

The State's proposed instruction largely tracked Lolani's but added one element: "1. [Lolani]; *2. Under circumstances not amounting to murder*; 3. While intentionally or knowingly attempting, with unlawful force or violence, to do bodily injury to [Dylan]; 4. Caused the death of [Dylan]." (Emphasis added.)

¶13    The district court elected to use the State's proposed instruction, and Counsel did not object. Another instruction informed the jury that it "must determine whether the defendant is guilty of Murder, guilty of Homicide by Assault, or not guilty of either offense." The instruction also explained that while the jury was "not require[d] . . . to make these determinations in any particular order," it could not "find the defendant guilty of both Murder and Homicide by Assault."

¶14    The jury convicted Lolani of murder. He timely appeals.

ISSUE AND STANDARD OF REVIEW

¶15    On appeal, Lolani argues that Counsel rendered ineffective assistance by failing to object to the homicide-by-assault instruction. "When a claim of ineffective assistance of counsel is raised for the first time on appeal, there is no lower court ruling to review and we must decide whether the defendant was deprived of the effective assistance of counsel as a matter of law." *State v. Gonzalez*, 2021 UT App 135, ¶ 6, 501 P.3d 1205 (cleaned up).

ANALYSIS

¶16    A defendant asserting a claim for ineffective assistance of counsel must show that "(1) counsel's performance was objectively deficient and (2) the deficient performance resulted in prejudice." *State v. Fleming*, 2019 UT App 181, ¶ 9, 454 P.3d 862 (citing *Strickland v. Washington*, 466 U.S. 668, 687–88 (1984)). The reviewing court need not always address both prongs because the defendant must establish each to prevail on an ineffective assistance claim. *Id.* Here, we need not address deficient performance because Lolani has not established that he was prejudiced by the asserted errors.

¶17 To demonstrate prejudice "in the context of erroneous jury instructions," a defendant must show "a reasonable probability the jury" would not have rendered a conviction if the "instructions had been correct." *State v. Grunwald*, 2020 UT 40, ¶ 22, 478 P.3d 1. "A reasonable probability is a probability sufficient to undermine our confidence in the outcome. This determination hinges on the following questions: (1) did the error in the jury instructions create the possibility that the jury convicted the defendant based on factual findings that would not have led to conviction had the instructions been correct? and, (2) if so, is there a *reasonable probability* that at least one juror based its verdict on those factual findings?" *State v. Seach*, 2021 UT App 22, ¶ 24, 483 P.3d 1265 (cleaned up).

¶18 The first step in this analysis requires that we "identify the theoretical factual scenarios in which the error in the jury instructions permitted the jury to wrongfully convict the defendant." *Grunwald*, 2020 UT 40, ¶ 25. The second step mandates that we "determine whether there is a reasonable probability that, based on the totality of the evidence, a juror convicted the defendant based on one of those impermissible scenarios." *Id.* ¶ 26. "[I]f we conclude there is a reasonable probability a juror convicted the defendant based on one of the identified, impermissible factual scenarios (or rather, on an accepted version of events that would not have led to a conviction with a correct jury instruction), we may confidently hold that there is a reasonable probability the jury would not have reached a guilty verdict but for the errors in the jury instructions." *Id.*[8]

---

8. The State appears to argue that the two-step prejudice analysis articulated in *Grunwald* is no longer good law because our supreme court did not apply it in a later case. *See State v. Bonds*, 2023 UT 1, ¶¶ 53–58, 524 P.3d 581. Because *Grunwald* is directly on point here, however, we are bound to apply it until the

(continued…)

¶19 As an initial matter, we agree with Lolani and the State that the instruction was incorrect as a matter of law because "'under circumstances not amounting to' clauses (when accompanied by an associated list of other crimes) do not constitute elements of the actual crime that follows." *State v. Powell*, 2020 UT App 63, ¶ 34, 463 P.3d 705. Moreover, Lolani is correct that the instruction was erroneous to the extent it dictated the order in which the jury considered the homicide offenses, and we assume without deciding that the instruction was indeed erroneous in this respect. *See State v. Powell*, 872 P.2d 1027, 1031 (Utah 1994) (noting that district courts may not "mandate a specific order of deliberation to the jury concerning lesser included offenses" and that "such instruction should be given by way of suggestion and recommendation").

¶20 Invoking *Grunwald*, Lolani argues that Counsel's failure to object to the instruction prejudiced his defense. He asserts that *Grunwald*'s first step is "easily" met because "had the jury not been improperly precluded from considering the lesser included offense in this case, it certainly could have made a factual finding that . . . Lolani intended only to commit a regular assault on [Dylan], resulting in a conviction for the lesser offense of [h]omicide by [a]ssault."

¶21 We disagree. On this record, the asserted errors in the jury instruction simply did not create a possibility that the jury convicted Lolani based on factual findings that would not have led to conviction had the instructions been correct. To convict a defendant of murder, the State must establish, as is relevant here, that the defendant "intend[ed] to cause serious bodily injury to another individual" and "commit[ted] an act clearly dangerous to

supreme court expressly states otherwise. *See State v. Dickerson*, 2022 UT App 56, ¶ 36 n.4, 511 P.3d 1191 ("Principles of vertical stare decisis . . . compel[] a court to follow strictly the decisions rendered by a higher court." (cleaned up)).

human life that cause[d] the death of the other individual." Utah Code § 76-5-203(2)(b). Convicting a defendant of homicide by assault, by contrast, requires the State to show only that the defendant, "under circumstances not amounting to aggravated murder, murder, or manslaughter[,] . . . cause[d] the death of another individual . . . while intentionally or knowingly attempting, with unlawful force or violence, to do bodily injury to the other individual." *Id.* § 76-5-209(2)(a)–(b).

¶22   Lolani's telephone conversation with Wife the day before the incident is particularly probative of his intent to cause serious bodily injury to Dylan. Lolani told Wife that he would "fucking break" Dylan's "fucking face," that he had "been wanting to swing on" Dylan and "whoop his ass," and that he "might end up staying [in custody] longer . . . because [he] might break some part of [Dylan's] bones." And even Lolani appears to concede that the jury could have reasonably concluded that the words "were not just bluster or hyperbole."

¶23   And if Lolani's comments to Wife tend to show his intent, his previous encounter with Bouncer speaks to his *capacity* to commit an act clearly dangerous to human life that caused Dylan's death—and, more importantly, to Lolani's knowledge of that capacity. Indeed, Bouncer testified that, with a single punch, Lolani broke his orbital bone in four places and caused him to suffer a concussion and traumatic brain injury. This incident effectively placed Lolani on notice of his capacity to cause serious damage with even a single punch, let alone twenty. *Cf.* Utah R. Evid. 404(b)(2) (noting that other-acts evidence is admissible to prove knowledge).

¶24   Lolani stresses that Dylan may have survived but for the vertebral artery tear. He is obviously correct to the extent he suggests that a "death resulting from a fist fight" does not constitute murder per se. *Commonwealth v. Buzard*, 76 A.2d 394, 396 (Pa. 1950). As noted above, however, the incident can be

described as a "fistfight" in name only. *See supra* note 7. Indeed, Lolani's conduct went far beyond "regular" assault: the recording shows him viciously and mercilessly attacking Dylan, who does not appear to be defending himself, especially as the attack progresses.[9] And as Examiner quite correctly opined, blunt-force trauma to the head and neck can kill even when it does not cause vertebral artery tearing. It necessarily follows that an act inflicting such trauma can constitute an act clearly dangerous to human life.

¶25 In short, based on the evidence—including Lolani's comments to Wife, his previous assault on Bouncer, and footage of and testimony about the vicious beating itself—we cannot conclude that there is a theoretical scenario in which a jury, correctly instructed, would have determined that Lolani intended merely to inflict bodily injury on Dylan as opposed to *serious* bodily injury or that Lolani didn't commit an act clearly dangerous to human life. Stated otherwise, the asserted errors in the jury instruction simply didn't drive the outcome here. Had the jury not been told that "under circumstances not amounting to murder" was an element of homicide by assault and had it been properly instructed about the order in which it was to consider the offenses, the jury would still have been required to address whether Lolani intended to cause serious bodily injury to Dylan and whether he committed an act clearly dangerous to human life that caused Dylan's death. And we have a good idea how the jury would have resolved that issue: the same way it resolved the issue at trial.

¶26 Therefore, we are confident that the asserted errors in the jury instruction fell far short of "creat[ing] the possibility that the jury convicted [Lolani] based on factual findings that would not have led to conviction had the instructions been correct." *See*

_____

9. As one witness observed, the blows were "so bad that [they] were knocking [Dylan] out and waking him up one after the other."

*Grunwald*, 2020 UT 40, ¶ 22. For this reason, we necessarily conclude that no reasonable probability existed that even a single juror would have voted to do anything other than convict Lolani of murder if the jury had been properly instructed. *See id.* ¶ 26 ("[*A*]*fter we have identified the factual scenarios that theoretically could have formed the basis of a wrongful conviction*, we must determine whether there is a reasonable probability that, based on the totality of the evidence, a juror convicted the defendant based on one of those impermissible scenarios." (emphasis added)).

¶27　Therefore, Lolani's claim fails for lack of prejudice.

CONCLUSION

¶28　The district court's inclusion of the "under circumstances not amounting to" language in the jury instruction on homicide by assault was incorrect as a matter of law. For purposes of this case, we have also assumed that the instruction was erroneous to the extent that it dictated the order in which the jury considered the offenses. Based on the facts of this case, however, Lolani was not prejudiced by Counsel's failure to object. We are not persuaded that there was a possibility that the jury would have convicted him of homicide by assault instead of murder had it been properly instructed. For this reason, we necessarily conclude that no reasonable probability exists that even one juror would have done anything other than vote to convict Lolani of murder if the instruction had correctly stated the law. We therefore affirm.

———————