**2026 UT App 30**

# THE UTAH COURT OF APPEALS

STATE OF UTAH,
Appellee,
*v.*
JOSE HUMBERTO MANCIA,
Appellant.

STATE OF UTAH,
Appellee,
*v.*
ARGENIS DANIEL RAMIREZ SAEDT,
Appellant.

STATE OF UTAH,
Appellee,
*v.*
ROSALIO ANDRES ALVAREZ,
Appellant.

Opinion
Nos. 20230735-CA, 20230760-CA, 20240282-CA
Filed March 5, 2026

Third District Court, Salt Lake Department
The Honorable Randall N. Skanchy
Nos. 171910155, 171910158, 171910156

Erick Grange, Attorney for Jose Humberto Mancia

Dain E. Smoland and Staci A. Visser, Attorneys for
Argenis Daniel Ramirez Saedt

Darcy M. Goddard and S. Spencer Brown, Attorneys
for Rosalio Andres Alvarez

Derek E. Brown, Daniel L. Day, Terry M. Crist, and
David A. Simpson, Attorneys for the State

JUDGE AMY J. OLIVER authored this Opinion, in which JUDGES MICHELE M. CHRISTIANSEN FORSTER and JOHN D. LUTHY concurred.

─────────

OLIVER, Judge:

¶1 Defendants Jose Humberto Mancia, Argenis Daniel Ramirez Saedt, and Rosalio Andres Alvarez were each convicted by a jury on two counts of murder for the deaths of Lloyd Pace and Tami Woodward. While fleeing the scene of a drive-by shooting in a stolen truck, Defendants collided with Pace and Woodward's car, killing them. Defendants now appeal, arguing that their trial counsel were ineffective in a variety of ways.[1] We reject their arguments and affirm their convictions.

BACKGROUND[2]

*The Conflict Between the Norteños and the Sureños*

¶2 The Norteños and the Sureños are two rival street gangs with a presence in Salt Lake County. Beginning in December 2016 and continuing into August 2017, several prominent Norteños members were killed. The Norteños blamed the Sureños for these killings. Specifically, they blamed a Sureños member named

─────────

1. Mancia, Saedt, and Alvarez were each represented by separate counsel at the joint trial.

2. "In an appeal from a jury trial, we review the record facts in a light most favorable to the jury's verdict and recite the facts accordingly, and we present conflicting evidence only as necessary to understand issues raised on appeal." *State v. Kufrin*, 2024 UT App 86, n.1, 551 P.3d 416 (cleaned up).

Manuel.[3] The Norteños were seeking "revenge" and Manuel and his family, some of whom are also Sureños members, "were target number one."

¶3 Defendants are all Norteños members. On September 10, 2017, Saedt texted Mancia, "[Manuel] seen at the [gas station] in R[ose] P[ark]." Several days later, Manuel posted a photo on Facebook depicting him wearing Sureños paraphernalia with the caption, "We running these streets [Sureños] gang NK," which stood for "Norteños Killers." The purpose of the post was to "mock[]" the Norteños and to "call[] them out." Mancia saved Manuel's post on his phone a little over an hour after it was posted.

*The September 18 Shooting*

¶4 On September 18, 2017, the owner (Truck Owner) of a blue Ford Raptor (the Raptor) contacted police after discovering that the Raptor was missing from the front of her house. She also reported to police that several guns had been stolen from the closet in the primary bedroom of her house, including a SIG Sauer and a gold Desert Eagle.

¶5 Later that night, a police officer (Officer 1) responded to a report of a shooting at the house Manuel shared with his family (the Residence). As Officer 1 searched the area, he found shell casings in the road and noticed damage to a silver Lexus parked across the street from the Residence. A shell casing matched the SIG Sauer that was reported stolen earlier that day. He also found a handgun underneath the Lexus.

¶6 Officer 1 spoke with Manuel's mother (Mother) that night. Mother told him she was outside of the Residence when she saw

---

3. A pseudonym.

the Raptor drive by the Residence three times. She told Officer 1 that on the third drive-by, she saw a hand come out of the truck and, thinking she would be shot at, she ran into the Residence. She heard four to five shots. A neighbor (Neighbor) corroborated Mother's account of the shooting, telling police she had woken up to gunfire that night. Further, the Metro Gang Unit, a task force comprised of various law enforcement agencies in Salt Lake County with the goal of "quell[ing]. . . gang violence . . . and crime," had previously placed a pole camera at the Residence as part of its gang interdiction efforts. The pole camera picked up video of the drive-by shooting around 10:30 p.m.

*The September 19 Shooting and Car Accident*

¶7　　The following evening, September 19, 2017, Neighbor was working on her car in her driveway when she heard noises that "sounded like . . . gunshots." Neighbor stepped onto the sidewalk and saw gunfire coming from the Raptor, which was driving away from the Residence. The Raptor "fl[ew]" out of the subdivision without braking. It hit a dip in the road and "caught air" such that the bystanders "could see the undercarriage of the [Raptor] and all the tires" before it came back down and landed on top of a Toyota Yaris (the Yaris). After landing on the Yaris, the Raptor "went upside down" and rolled through the intersection before stopping with its roof on the ground. Neighbor, along with a driver (Driver) and passenger (Passenger) in a car driving by, witnessed the Raptor hit the Yaris. The Yaris ended up "pinned between" a truck parked in a driveway and a garage. Pace and Woodward, who were in the Yaris, did not survive.

¶8　　Defendants were in the Raptor at the time of the accident. After the crash, half of Saedt's body was "hanging out of" the Raptor. Mancia and Alvarez were able to exit the Raptor and flee on foot before being apprehended in a neighbor's backyard.

Alvarez had a gunshot wound to his back, and he and Saedt were taken to the hospital.

¶9 Defendants were each charged with two counts of felony murder with gang enhancements, one count of felony discharge of a firearm with a gang enhancement, and one count of theft by receiving stolen property.

*The Trial*

¶10 At a joint jury trial, the State called seventeen witnesses,[4] including Neighbor, Passenger, Driver, a police investigator (Investigator), Truck Owner, Officer 1, a police detective (Detective), and a medical examiner (Medical Examiner), who together testified to the above facts. The State also called Mother, a forensic scientist (Forensic Scientist), the officer who interviewed Mother after the September 19 shooting (Interviewer), a firearms analyst (Firearms Expert), another police officer (Officer 2), a gang expert (Gang Expert), and Pace's sister (Sister).

¶11 Neighbor testified that on September 19, she could not tell if all the shots had come from the Raptor or if some had come from the Residence as well. She testified that after the accident, she witnessed a man run from the Raptor. She also testified that an individual came from the Residence toward the scene of the accident and yelled, "I'll catch you on the rebound."

¶12 Passenger testified that the Yaris was approximately four and a half to five feet tall and the Raptor went high enough into

---

4. A fourth defendant in this case pled guilty and was therefore not tried with Defendants. We do not recount the testimony of the witnesses who spoke solely to that individual's involvement, as it is not relevant to this appeal.

the air to land on top of it. She stated that the Raptor rolled in the air, "landed on one side," and then "finished flipping" onto its roof. She testified that after witnessing the accident, she immediately got out of her car to help. When she got to the Yaris, Woodward was already deceased, and Pace was still breathing, but his pulse was "really weak." She further indicated that as she checked on Pace, she saw a male exit the Raptor and "t[ake] off running." She testified she saw a male in a white t-shirt "stuck" in the Raptor and saw guns and magazines lying on the ground around the Raptor.

¶13    Driver testified that he parked his car after witnessing the accident and he followed Passenger on foot to the scene. He testified that Passenger called 911 and that he spoke to the dispatcher while Passenger checked the pulses of the individuals in the Yaris. He stated he saw a male in front of the Raptor who "hesitated a little bit" before "running into the neighborhood" and saw guns on the ground near the Raptor. Driver also testified he saw another truck drive to the end of the Residence's street and stop at the dip where the Raptor caught air. The driver of the truck got out and ran across the road until he was ten to fifteen feet from the scene of the accident before yelling, "[W]hat now, bitch? What's up bitch?" Driver testified the man then told the crowd that had gathered at the scene of the accident that the individuals in the Raptor had been shooting at "[his] house."

¶14    After being granted immunity by the State, Mother agreed to testify. Mother testified she could not remember anything because she has "a sickness" and was "on a lot of different kind[s]" of medications. She testified she could not remember telling police the Raptor from the September 19 shooting was the same vehicle involved in the September 18 shooting, though Officer 1 later testified she had. She also did not recall telling police that she assumed it was the same individuals involved in

both shootings. Mother did not recall telling police that she was outside on the driveway when the shots were fired on September 19, or that multiple gunshots were fired. Mother also did not recall telling police that when the shooting happened, a male in the rear passenger seat of the Raptor, who was wearing glasses, "pull[ed] his arm out with the gun." Nor did she recall telling police she saw a male in a white shirt and a male in a red shirt inside the Raptor. Finally, she did not recall telling police her husband got into his truck after the accident.

¶15     Interviewer testified that Mother did not appear to be impaired or in an altered mental state at the time he interviewed her. Interviewer stated Mother recalled the incidents "very clearly."

¶16     Forensic Scientist testified that she tested evidence from the accident for DNA. She said DNA found on the driver side front airbag and the driver side door matched Alvarez's profile and DNA found on the passenger side front airbag and the driver headrest matched Saedt's profile. Forensic Scientist further testified DNA found on the SIG Sauer matched Saedt's profile, while DNA found on a Taurus gun matched Alvarez's profile.

¶17     Detective testified that the SIG Sauer, gold Desert Eagle, and Taurus were all recovered in or around the Raptor. He testified he reviewed pole camera footage and footage from a neighbor's doorbell camera following the accident, and he confirmed the events captured on the pole camera were consistent with what he observed at the scene.

¶18     Firearms Expert testified that three of the spent cartridges found at the scene were fired from the Desert Eagle and one of the two recovered bullets was fired from the same Desert Eagle. He testified he was unable to match any casings or bullets to the Taurus, and there was no evidence that the SIG Sauer was fired

the night of the accident. He testified that the shell casing recovered after the September 18 shooting matched the SIG Sauer recovered at the scene of the accident.

¶19 Officer 2 testified that the Taurus was recovered with one cartridge, and an "unspent shell casing." He also testified the SIG Sauer held a full eight-round magazine and a round in the chamber. Finally, he testified the Desert Eagle was recovered with a spent shell casing and a magazine with four rounds inside.

¶20 Medical Examiner testified that Pace died from blunt injuries to his head, chest, and torso, and he testified Woodward died from "blunt injuries [to] her head." He further testified he found nothing in either autopsy to suggest the cause of death for either victim was anything other than the blunt force injuries.

¶21 Gang Expert testified to Defendants' Norteños involvement, pointing to their various tattoos, clothing, and social media posts. Gang Expert also testified about a video taken on Alvarez's phone at 5:18 p.m. on September 19, 2017. In the video, Alvarez is sitting in the passenger seat of the Raptor and wearing a red T-shirt, and Saedt is driving and wearing a white T-shirt. Gang Expert also testified about photographs depicting Mancia wearing glasses.[5]

¶22 Sister testified that Pace and Woodward were engaged. At the beginning of her testimony, the State showed a picture of Pace, and the following exchange then occurred:

> Q: Tell me about [Pace].
>
> A: [He] was a big-hearted person. He loved his family. He loved his friends. He was out to help

---

5. At trial, Mancia was not wearing glasses, but Alvarez was.

everybody. Just a kind-hearted fellow. You can tell by the smile on his face. That's a really good picture.

He would help me decorate the yard during the holidays, help me with Halloween. Halloween was his favorite.

. . . .

Q: Tell me about [Woodward].

A: [She] was really nice. [She] and my daughter were really close friends. She had a couple granddaughters that she worshipped, she loved to be around, would go to their soccer games.

She would take [Pace] to work every day and pick him up.

¶23    The State then asked Sister to speak about September 19, 2017. Sister testified she was hosting a family gathering that evening and had planned to discuss a celebration of life that was going to be held for her and Pace's mother, who had recently passed away. Sister testified Pace and Woodward "did not show up." She testified she had gone to bed, and her oldest daughter woke her up after police rang the doorbell. The police informed Sister that both Pace and Woodward had been killed in an accident.

¶24    The State then asked Sister, "What was your reaction to that news?" Sister responded, "I freaked out. I couldn't stand it because [Pace] is—was my rock, my person. And I had a heart attack that night and then wound up in the hospital for a few days. They said . . . my heart attack wasn't caused from a broken heart, but I think it was." The State asked, "So how has your life been

changed since [Pace's] and [Woodward's] death[s]?" Sister answered, "I'm not the same person." At this point, Alvarez's counsel objected. The State withdrew the question, and Sister's testimony concluded.

¶25 At the close of evidence, the court instructed the jury. Reflected in the instructions was the State's party liability theory of the case. Instructions 40 (Mancia), 44 (Saedt), and 48 (Alvarez) identically stated that Defendants could not be convicted of felony discharge of a firearm[6] unless the jury found beyond a reasonable doubt that, as parties to the offense, they

> a. Intentionally, knowingly, or recklessly discharged a firearm in the direction of any person or persons knowing or having reason to believe that any person may be endangered by the discharge of a firearm;
>
> OR
>
> b. Intentionally, knowingly, or recklessly discharged a firearm in the direction of any person or habitable structure with the intent to intimidate or harass another;
>
> OR

---

6. For felony murder to apply, Defendants needed to be convicted of felony discharge of a firearm. The felony murder instructions provided that the jury could not convict any defendant without finding that they "acted with the intent required as an element of Felony Discharge of a Firearm."

c. Acting with the mental state required to commit the offense of Felony Discharge of a Firearm:

> i. Intentionally, knowingly, or recklessly solicited, requested, commanded, or encouraged another person to commit the offense,
>
> OR
>
> ii. Intentionally aided another person to commit the offense.

¶26 Instruction 34 stated the jury could find Defendants guilty as a "party to the offense" only if it found "beyond a reasonable doubt" that:

> 1. The person had the mental state required to commit the charged offense; AND
>
> 2. The person . . . [i]ntentionally, knowingly, or recklessly solicited, requested, commanded or encouraged another person to commit the charged offense; AND
>
> 3. The charged offense was committed either by that person or another person.

¶27 Instruction 35 stated,

> Prior knowledge that a crime is about to be committed or is being committed does not make a person a party to the offense, and thereby subject them to criminal prosecution[,] unless that person has the mental state required to commit the crime,

he solicits, requests, commands, encourages, or
intentionally aids in the perpetration of the crime,
and the crime is committed.

¶28　The jury instructions also included a general unanimity instruction, which stated, "This being a criminal case, your verdict must be unanimous; all jurors must agree."

¶29　In closing, the State argued the evidence showed that Alvarez was driving the Raptor, Saedt was in the front passenger seat, and Mancia was in the rear driver side seat and was the shooter. Regarding mens rea, the State explained the meaning of "[e]ncouraged or aided," saying, "Encouraged by definition is to support. To be there to allow whatever [is] supposed to happen, to make sure it's going to happen. And if the actual offense was committed by someone, that there was actual felony discharge, anyone who is a party to that is guilty." The State then went on to give a sports metaphor, explaining that a backup quarterback on the winning Super Bowl team who merely stands on the sidelines and helps with play calls "gets the ring" even if he "had never thrown a play, had never thrown a pass, [and] all he did was put on a uniform and show up." The State then likened Defendants' clothing, tattoos, and social media posts to being on the Norteños' team.

¶30　The jury then retired to deliberate. During deliberations, the jurors submitted a question to the court, asking, "How does a party liability effect [sic] felony discharge of a firearm[?]" The court and the parties agreed to direct the jurors to Instructions 34, 35, 40, 44, and 48. The jurors were told to "read these instructions in conjunction with each other."

¶31　The jury convicted Defendants as charged. They were each sentenced to fifteen years to life to be served consecutively for

both murder counts, and the State stipulated to the dismissal of the other counts.

ISSUES AND STANDARDS OF REVIEW

¶32   Defendants each assert that their counsel provided constitutionally ineffective assistance in a variety of ways at trial. "When an ineffective assistance claim is raised for the first time on appeal, it presents a question of law." *State v. Cortez-Izarraraz*, 2025 UT App 116, ¶ 22, 575 P.3d 1240 (cleaned up).

¶33   Defendants also argue the errors were cumulatively prejudicial. When applying the doctrine of cumulative prejudice, we consider "the standard of review applicable to each underlying claim of error and reverse if the cumulative effect of the several errors undermines our confidence that a fair trial was had." *State v. King*, 2017 UT App 43, ¶ 15, 392 P.3d 997 (cleaned up).

ANALYSIS

I. Ineffective Assistance

¶34   To succeed on a claim of ineffective assistance of counsel, a defendant must show (1) "counsel's performance was deficient" and (2) counsel's "deficient performance prejudiced the defense." *Strickland v. Washington*, 466 U.S. 668, 687 (1984). "A defendant's inability to establish either element defeats a claim for ineffective assistance of counsel." *State v. Miller*, 2023 UT App 85, ¶ 25, 535 P.3d 390 (cleaned up). "Because failure to establish either prong of the test is fatal to an ineffective assistance of counsel claim, we are free to address [an appellant's] claims under either prong." *See State v. Popp*, 2019 UT App 173, ¶ 25, 453 P.3d 657 (cleaned up).

¶35 To establish deficient performance, a defendant "must demonstrate counsel's representation fell below an objective standard of reasonableness. The deficient performance inquiry should focus on whether counsel's assistance was reasonable considering all the circumstances, and it must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." *State v. Sandoval*, 2024 UT App 186, ¶ 19, 562 P.3d 731 (cleaned up).

¶36 To establish prejudice, a defendant "must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *State v. Forbush*, 2024 UT App 11, ¶ 25, 544 P.3d 1. "A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.* (cleaned up). "When evaluating a prejudice claim in the ineffective assistance context, we assess counterfactual scenarios—that is, what would have happened but for the ineffective assistance, and we may do so with the evidence available to us, even when not part of the original record." *Id.* (cleaned up).

¶37 Here, Defendants each assert multiple instances of ineffective assistance of counsel. Some of their arguments are shared, while others are unique to an individual defendant. We address each argument in turn, indicating below who argues in each instance.

A. Mens Rea Jury Instructions

1. Definitions of Mens Rea

¶38 Defendants each argue that his respective counsel was ineffective for failing to request a jury instruction defining the mens rea of "recklessly" as that term is used in the context of accomplice liability. Specifically, Defendants argue the

instructions created the possibility that they were convicted based on a layperson's likely understanding of what it means to recklessly solicit, request, command, or encourage the discharge of a firearm rather than the legal definition. We disagree based on a lack of prejudice.

¶39  "When applying *Strickland*'s prejudice analysis in the context of erroneous jury instructions, we must determine whether there is a reasonable probability the jury would not have convicted the defendant if the jury instructions had been correct." *State v. Grunwald*, 2020 UT 40, ¶ 22, 478 P.3d 1. In determining whether such a probability exists, we consider two questions: (1) "did the error in the jury instructions create the possibility that the jury convicted the defendant based on factual findings that would not have led to conviction had the instructions been correct?" and (2) "if so, is there a *reasonable probability* that at least one juror based its verdict on those factual findings?" *Id.*

¶40  The first step in our analysis requires us to "identify the theoretical factual scenarios in which the error in the jury instructions permitted the jury to wrongfully convict" Defendants. *State v. Lolani*, 2025 UT App 138, ¶ 18, 581 P.3d 1024 (cleaned up). In the second step, "we determine whether there is a reasonable probability that, based on the totality of the evidence, a juror convicted the defendant based on one of those impermissible scenarios." *Id.* (cleaned up).

¶41  On the first step, Defendants argue that the jury could have convicted them not based on criminal recklessness—which requires the actor's conduct to be a "gross deviation from the standard of care that an ordinary person would exercise under all the circumstances as viewed from the actor's standpoint," Utah Code § 76-2-103(3)—but based on the lay notion that simply being armed and in a car amounts to reckless behavior. This court has

previously identified a scenario where the lack of a definition of "recklessly" prejudiced a defendant. *See State v. Liti*, 2015 UT App 186, ¶¶ 22–23, 355 P.3d 1078. There, our court considered a reckless manslaughter case where the defendant claimed he shot and killed his friend by accident. We concluded that the omission of the "gross-deviation requirement" in the definition of recklessness prejudiced the defendant because while his conduct of "drawing a gun, arming it, and exercising poor trigger discipline created a substantial and unjustifiable risk of death to another," it was not necessarily "a 'gross deviation' from what a reasonable person may have done under the [threatening] circumstances" the defendant found himself in. *Id*. But there is no such scenario here.

¶42 On the record before us, the lack of a legal definition of recklessly "simply did not create a possibility that the jury convicted [Defendants] based on factual findings that would not have led to conviction" had the definition been included. *Lolani*, 2025 UT App 138, ¶ 21. As applicable here, a person acts "[r]ecklessly with respect to . . . the result of his conduct when he is aware of but consciously disregards a substantial and unjustifiable risk that" his conduct will encourage another to unlawfully discharge a firearm. Utah Code § 76-2-103(3); *see also id.* § 76-10-508.1. "The risk must be of such a nature and degree that its disregard constitutes a gross deviation from the standard of care that an ordinary person would exercise under all the circumstances as viewed from the actor's standpoint." *Id*. § 76-2-103(3). Instructions 40, 44, and 48 provided that Defendants could be convicted of felony discharge of a firearm via party liability if the jury found that any of them, "[a]cting with the mental state required to commit the offense of Felony Discharge of a Firearm," "[i]ntentionally, knowingly, or recklessly solicited, requested, commanded, or encouraged another person to commit the

offense" or "[i]ntentionally aided another person to commit the offense."

¶43 A jury would easily understand that riding with fellow gang members while armed to the house of a targeted member of a rival gang in the midst of ongoing retaliatory violence presented a substantial and unjustifiable risk that one's fellow gang member would feel encouraged by such conduct to commit felony discharge of a firearm. Likewise, there is no reasonable probability that the jury convicted Defendants based on the notion that riding with fellow gang members while armed is reckless in the colloquial sense and that if the jury had been told it had to find that Defendants' conduct constituted a gross deviation from what an ordinary person would do in the same circumstances the verdict would have been different.

¶44 In other words, "the asserted errors in the jury instruction simply didn't drive the outcome here." *Lolani*, 2025 UT App 138, ¶ 25. Had the jury been given the legal definition of recklessly, it would not have changed the verdict because the evidence supporting party liability was overwhelming. At trial, the jury heard testimony that Defendants were Norteños members and that the Norteños blamed the Sureños—in particular, Manuel—for the deaths of several of their prominent members. The jury heard testimony that because the Norteños blamed Manuel, the Norteños sought "revenge" against him, such that the Norteños considered Manuel's family "target number one." The jury heard testimony suggesting Defendants were keeping tabs on Manuel, as evidenced by Saedt's text to Mancia prior to the shootings, "[Manuel] seen at the [gas station] in R[ose] P[ark]." The jury heard testimony Manuel had mocked the Norteños by posting a photo on Facebook of himself wearing Sureños paraphernalia with a caption that included the abbreviation "NK" or "Norteños Killers" and Mancia later saved this post to his phone.

¶45    Further, the jury heard testimony that Defendants engaged in a drive-by shooting at the Residence the prior evening after circling it three times in the Raptor. The jury heard testimony that the Raptor returned the following evening to the Residence and a male inside the Raptor wearing glasses, like Mancia, fired shots. Two of the other individuals in the Raptor were wearing a white shirt and a red shirt, like Saedt and Alvarez were wearing at the time of the accident. The jury heard testimony that DNA found on the driver side front airbag and the driver side door matched Alvarez and DNA found on the passenger side front airbag and the driver headrest matched Saedt. The jury also heard testimony that the Desert Eagle had been fired, and DNA found on the SIG Sauer and the Taurus—which were both loaded—matched Saedt's and Alvarez's respective DNA profiles. The jury also learned that after the accident, Mancia and Alvarez were apprehended in a neighbor's backyard and Alvarez had a gunshot wound, while Saedt was found with half of his body "hanging out of" the Raptor.

¶46    Based on the "totality of the evidence" presented to the jury, there is no "reasonable probability" that if the jury had been instructed it had to find that Defendants' conduct constituted a gross deviation from what an ordinary person would do in the same circumstances, the verdict would have been different. *State v. Lolani*, 2025 UT App 138, ¶ 18, 581 P.3d 1024 (cleaned up). Indeed, the evidence painted a clear picture for the jury that Defendants' conduct constituted a gross deviation from what an ordinary person would do in the same circumstance. Specifically, there is no reasonable likelihood that the jury would have determined that an ordinary person—even one in the gang scenario in which Defendants were operating—would obtain a weapon and join an excursion that by every indication was aimed at inflicting extrajudicial violence as retaliation for the crimes of others. Nor is it reasonably likely that a jury would determine that

riding with fellow gang members while armed to the residence of a targeted rival in the midst of ongoing retaliatory violence did not present a substantial and unjustifiable risk that one's fellow gang member would feel encouraged by such conduct to commit felony discharge of a firearm.

¶47    To resist the conclusion that including the definition of recklessness would not change the jury's verdict, Mancia and Saedt direct us to *State v. Bird*, 2015 UT 7, 345 P.3d 1141. There, the appellant was charged with failure to respond to an officer's signal to stop under Utah Code section 41-6a-210(1)(a), which provides that "an operator who receives a visual or audible signal from a peace officer to bring the vehicle to a stop may not: . . . attempt to flee or elude a peace officer by vehicle or other means." At the close of trial, defense counsel objected to the elements instruction for the failure-to-respond charge because "it did not outline the mental state required for the offense" and "the requisite mental state needed to be defined for the jury." *Id.* ¶ 4 (cleaned up). The district court overruled the objection. *Id.* On appeal, the defendant argued the elements instruction needed to identify "the requisite mental state for the jury because the mens rea implications of the terms 'receive' and 'attempt' [were] unclear." *Id.* ¶ 8. Our supreme court agreed with the defendant, reasoning that "a juror would likely have perceived that the 'receives a visual or audible signal from a peace officer' element of the offense require[d] knowledge of the peace officer's signal" but that it could not be assumed "that a juror would recognize the significance of this knowledge requirement as an essential mens rea element." *Id.* ¶ 20.

¶48    The jury instructions in the case before us, however, are different from those in *Bird*. There, the jury instructions did not include the required mental state of "knowingly" and left it to the jury to deduce what mental state was required. *See id.* ¶¶ 4, 20.

Here, unlike in *Bird*, the required mental states were clearly provided to the jury in the text of Instructions 40, 44, and 48. *See supra* ¶¶ 25–27. Thus, *Bird* does not dictate the outcome in the instant case.

¶49    In sum, we see no theoretical factual scenario in which the failure to include the legal definition of recklessly in the jury instructions "permitted the jury to wrongfully convict" Defendants. *Lolani*, 2025 UT App 138, ¶ 18 (cleaned up). Accordingly, Defendants were not prejudiced by counsel's failure to object to the jury instructions.

2.    Formatting of Instructions

¶50    Saedt and Alvarez also argue party liability involves a layered mens rea that, in this case, was "confusing" for the jury to understand in light of the instructions it was given. Although they essentially concede that the relevant jury instructions were correct statements of the law, they take issue with the format of Instructions 44 and 48 respectively. As written, Instructions 44 and 48 outlined liability for both felony discharge of a firearm and accomplice liability for felony discharge of a firearm. Saedt and Alvarez assert that it was improper to include both instructions together and, therefore, that counsel was ineffective by not objecting to the instructions and requesting they be separated. We disagree because counsel's performance was not deficient.

¶51    Saedt and Alvarez argue that the jury instructions were confusing because they addressed the mental state for both the felony discharge of a firearm and party liability in the same instruction. While they assert that the jury instructions could have been clearer, they do not assert that these jury instructions misstated the law. And where the jury instructions were legally correct, there can be no deficient performance by counsel in failing to object to the instructions. *See State v. Seach*, 2021 UT App 22,

¶ 16, 483 P.3d 1265 (holding that the "failure to object to jury instructions that correctly state the law is not deficient performance, and cannot, by definition, lead to prejudice." (cleaned up)). Accordingly, Saedt's and Alvarez's counsel did not perform deficiently in failing to object to legally correct jury instructions.

### B. Character and Victim Impact Testimony

¶52 Defendants each argue their respective counsel provided ineffective assistance by not objecting to the admission of Sister's testimony, which they assert amounted to character and victim impact testimony. For the purposes of our analysis, we assume, without deciding, that Defendants' counsel performed deficiently by failing to object to Sister's testimony.[7] We therefore turn to whether that failure "prejudiced the defense." *Strickland v. Washington*, 466 U.S. 668, 687 (1984).

¶53 We envision a counterfactual scenario where Sister testified only that Pace and Woodward were engaged and on their way to Sister's house at the time they were killed. In this version of events, Sister would not testify about Pace's or Woodward's character or about the impact their deaths had on her life. In that scenario, there is still no reasonable likelihood that the jury would have done anything other than convict Defendants. The jury heard overwhelming evidence supporting the State's theory of the case—namely, that Defendants engaged in a drive-by shooting at the Residence in retaliation for Manuel's alleged involvement in the deaths of several Norteños members and that when fleeing the scene of the shooting, the Raptor they were driving collided with the Yaris, killing Pace and Woodward.

---

7. While Alvarez's counsel did eventually object to Sister's testimony, Alvarez asserts that his counsel objected too late.

¶54 We believe there is no reasonable likelihood that the jury would have acquitted Defendants if it had not heard Sister's testimony that humanized Pace and Woodward or shared the impact they had on Sister's life. That the loss of her brother would have had an impact on Sister would have been obvious to the jury, regardless of Sister's testimony. And we are not persuaded that the tipping point for the jury's decision was hearing a family member talk positively about her lost loved ones. Therefore, Defendants were not prejudiced by their counsel's failure to object to Sister's testimony and they received effective assistance.[8]

C.      Unanimity Instruction

¶55 Mancia and Alvarez argue that their counsel provided ineffective assistance by failing to request a specific unanimity instruction. They argue they could have been convicted of felony discharge of a firearm in four ways: (1) intentionally, knowingly, or recklessly shooting at Mother; (2) intentionally, knowingly, or recklessly shooting at the Residence; (3) intentionally, knowingly, or recklessly soliciting, requesting, commanding, or encouraging the shooting; or (4) intentionally aiding the shooting. And because the felony murder charges depended on the intent underlying the felony discharge, they argue "the jury could have been divided four different ways when it found" Mancia and Alvarez "guilty of felony discharge of a firearm and felony murder." They

---

8. Saedt alone argues in the alternative that the district court plainly erred by allowing the admission of Sister's testimony. Because "the prejudice test is the same whether under the claim of ineffective assistance or plain error," *State v. Popp*, 2019 UT App 173, ¶ 40, 453 P.3d 657 (cleaned up), Saedt's plain error argument fails for the same reasons his ineffective assistance argument does.

therefore assert it was ineffective assistance for counsel to not request a specific unanimity instruction.

¶56 The Unanimous Verdict Clause of the Utah Constitution requires the verdict in criminal cases to be unanimous. Utah Const. art. 1, § 10. Unanimity is not met "if a jury unanimously finds only that a defendant is guilty *of a crime*." *State v. Hummel*, 2017 UT 19, ¶ 26, 393 P.3d 314 (cleaned up). Rather, it "requires unanimity as to each count of *each distinct crime charged* by the prosecution and submitted to the jury for decision." *Id.* (cleaned up). Furthermore, "a jury must be unanimous on all elements of a criminal charge for a conviction to stand." *Id.* ¶ 29 (cleaned up).

¶57 Mancia and Alvarez's argument is akin to the arguments made by the appellant in *State v. Hummel*, 2017 UT 19, 393 P.3d 314. There, the appellant argued there were "multiple 'theories' behind the charges of theft against him," including, (1) "extortion by threatening to subject someone to criminal confinement," (2) "extortion by threatening to take or withhold official action," (3) "extortion by threatening to cause a public official to take or withhold official action," (4) "deception by a false impression of law or fact," and (5) "deception by preventing another from acquiring information likely to affect his judgment." *Id.* ¶ 58. Hummel argued that the Utah Constitution required the jury to be unanimous as to the theory of theft under which it convicted him. *Id.* ¶ 18. But the supreme court clarified that "those 'theories' do not represent distinct criminal offenses with different elements in our substantive criminal law. Instead, they are definitional *examples*—and non-exhaustive ones—of the various means by which someone may commit the single offense of theft." *Id.* The court explained,

> The relevant parallel here would be to . . . a murder case with evidence of two alternative means by which it was committed—by poison and by suffocation. There is no distinct crime of murder by poison or murder by suffocation. And for that reason it cannot be said that these distinct theories or means of committing the murder are legally distinct, or more importantly, that they are legal *elements* that must be found unanimously by the jury to have a valid conviction under the Unanimous Verdict Clause.

*Id.* ¶ 62.

¶58   The same is true here. Mancia and Alvarez conflate the theories or means of committing felony discharge with the legal elements of the crime. The statute provided, in relevant part;

> [A]n individual who discharges a firearm is guilty of a third degree felony . . . if:
>
> (a) the actor discharges a firearm in the direction of one or more individuals, knowing or having reason to believe that any individual may be endangered by the discharge of the firearm; [or]
>
> (b) the actor, with intent to intimidate or harass another or with intent to damage a habitable structure . . . , discharges a firearm in the direction of any individual or habitable structure.

Utah Code § 76-10-508.1(1). Discharging a firearm was the element that the jury must have agreed upon. Subsections (a) and (b) provided the theories or means of discharging a firearm and thus committing felony discharge. The jury did not need to agree

on whether Mancia or Alvarez discharged the firearm in accordance with subsection (a) or subsection (b) because they were different ways to commit the same crime.

¶59 And because party liability is not a separate charge from discharge of a firearm and is merely an additional way of being held liable for felony discharge, the jury did not need to agree on which person solicited, requested, commanded, encouraged, or intentionally aided another person to commit the felony discharge and which person actually discharged the gun. *See State v. Fitzwater*, 2026 UT App 10, ¶ 52 (holding that "the jury was not required to be unanimous as to whether [the defendant] was guilty as a principal or instead as an accomplice" because "murder as a principal and murder as an accomplice are not 'separate crimes' but are different ways of committing the 'single offense' of murder"). The jury only needed to have been unanimous that someone in the Raptor discharged a firearm and that each person in the Raptor knew, intended, or recklessly disregarded a substantial likelihood that the discharge would occur in order to find Mancia and Alvarez guilty. This is because, under the party liability theory the State presented at trial, even if neither Mancia nor Alvarez was the individual who actually discharged the firearm, they would still be liable as accomplices. *See* Utah Code § 76-2-202 ("Every person, acting with the mental state required for the commission of an offense who directly commits the offense, who solicits, requests, commands, encourages, or intentionally aids another person to engage in conduct which constitutes an offense shall be criminally liable as a party for such conduct.").

¶60 Further, because the felony murder charges were reliant on the felony discharge charge, unanimity on the act of discharging the firearm or party liability was sufficient to convict Mancia and Alvarez of felony murder. The State presented significant

evidence that Defendants wanted to get even with Manuel and the Sureños. The evidence demonstrated that no one in the Raptor was unaware that they were in the Raptor to engage in a drive-by shooting on September 19. Evidence at trial showed Defendants sought "revenge" for the deaths of their fellow gang members, they were keeping tabs on Manuel's location, and Manuel mocked the Norteños on Facebook. Evidence showed Mancia saved this Facebook post to his phone and several days later, Defendants engaged in not one drive-by-shooting, but two, on back-to-back nights, with each defendant armed with a loaded firearm.

¶61 For these reasons, Mancia's and Alvarez's counsel did not perform deficiently by failing to object to the jury instructions for lack of a specific unanimity instruction. Therefore, Mancia and Alvarez did not receive ineffective assistance of counsel.

D. Prosecution of a Minor

¶62 As Mancia was the only defendant who was a minor at the time he was charged, he alone argues his counsel provided ineffective assistance by failing to object to the prosecution of a minor under the theory of party liability. When Mancia was charged in 2017, Utah law granted the district court "exclusive original jurisdiction over all persons 16 years of age or older charged with an offense that would be murder or aggravated murder if committed by an adult." Utah Code § 78A-6-701(1) (2017). However, prior to trial, the statute was amended such that the district court had jurisdiction over a minor charged with murder or aggravated murder only if the minor "was a principal actor in an offense" (the Amended Statute). *Id.* § 80-6-502(1)

(2022).[9] Thus, Mancia argues his counsel should have "objected to party liability applying to a minor for felony murder" once the Amended Statute went into effect.

¶63    "The courts of this state operate under a statutory bar against the retroactive application of newly codified laws." *State v. Alvarado*, 2023 UT App 123, ¶ 19, 538 P.3d 633 (cleaned up). The one exception to this statutory bar is if the new statute is declared to apply retroactively. *See id.*; *see also* Utah Code § 68-3-3 ("A provision of the Utah Code is not retroactive, unless the provision is expressly declared to be retroactive."). Absent this exception, Utah courts "apply the law as it exists at the time of the event regulated by the law in question." *Alvarado*, 2023 UT App 123, ¶ 19 (cleaned up). Thus, we must determine "what event is regulated" by the Amended Statute. *Id.* "The event regulated differs, however, based on whether the law is substantive or procedural." *Id.* The difference between whether a law is substantive or procedural "is in the nature of the underlying occurrence at issue." *State v. Clark*, 2011 UT 23, ¶ 14, 251 P.3d 829. "On matters of *substance* the parties' primary rights and duties are dictated by the law in effect at the time of their underlying primary conduct (e.g., the conduct giving rise to a criminal charge . . . )." *Id.* "When it comes to the parties' *procedural* rights and responsibilities, however, the relevant underlying conduct is different: the relevant occurrence for such purposes is the underlying procedural act (e.g., filing a motion or seeking an appeal)." *Id.* Thus, the law governing a procedural act is "the law in effect at the time of the procedural act, not the law in place at

_____

9. The legislature has since renumbered the Amended Statute. As there are no material changes relevant to this appeal, we cite the current version of the statute for convenience.

the time of the occurrence giving rise to the parties' substantive claims."[10] *Id.*

¶64 Mancia argues the Amended Statute is procedural because it "controls the mode and form of procedure for enforcing the underlying substantive rights and merely affects the judicial machinery available for determining substantive rights." (Quoting *State v. Johnson*, 2012 UT 68, ¶ 12, 290 P.3d 21 (cleaned up).) The State argues the Amended Statute "fundamentally alters the scope of criminal liability—a quintessentially substantive change." Because substantive laws affect a party's primary rights and duties at the time of the underlying conduct, the State argues "restricting the available theories of prosecution for juvenile defendants . . . directly impacts the elements the State must prove to establish criminal liability." We agree with the State.

¶65 In *State v. Johnson*, the defendant sought to reduce the degree of his convictions when the relevant statute was amended after his plea was entered and accepted by the district court. *See* 2012 UT 68, ¶ 4, 290 P.3d 21. The supreme court concluded the relevant statute was substantive "with respect to [the defendant's] eligibility for reducing his convictions" because the statute "prescribe[d] the class of defendants who [were] eligible to seek reductions in convictions." *Id.* ¶ 13. The court reasoned that "changes in the class of eligible defendants would not merely

---

10. The State argued at trial that Mancia was the "principal actor to the offense." But given the jury was not required to determine who the principal actor was under the State's party liability theory, we take Mancia's argument that he was not the principal actor at face value. We thus evaluate what event is regulated by the Amended Statute, looking to whether the Amended Statute is substantive or procedural to guide us.

affect the judicial machinery available for determining substantive rights but would instead affect the scope of the substantive right." *Id.* (cleaned up). Applying *Johnson* here, the Amended Statute does not merely "control the mode and form of *procedure* for enforcing the underlying substantive rights;" it also "eliminates the substantive rights of a class of defendants." *Id.* ¶ 14 (cleaned up). If the Amended Statute applied, then Mancia could not be held criminally liable for the adult crime of murder or felony discharge and would instead face adjudication in juvenile court and be subject to different consequences. Therefore, the impact would not just be on the judicial machinery available for determining substantive rights but on the scope of the substantive right itself, making the Amended Statute substantive and not procedural.

¶66 Because the Amended Statute was substantive, Mancia's counsel's objection would not have succeeded. Accordingly, it was not deficient performance for counsel to forgo such an objection. *See State v. Soto*, 2022 UT App 107, ¶ 31, 518 P.3d 157 ("Where counsel could have reasonably believed that an objection was futile, counsel has not performed deficiently." (cleaned up)). And because counsel did not perform deficiently, Mancia fails to demonstrate that counsel was ineffective.

## II. Cumulative Prejudice

¶67 Finally, Defendants each argue that the multiple errors of their respective counsel were cumulatively prejudicial. We identified two issues above—the lack of a mens rea definition and the failure to object to Sister's testimony—where we assumed counsel's performance was deficient. *See supra* sections I.A.1 and I.B. "We now consider whether these two instances of [counsel's presumably] deficient performance prejudiced" Defendants. *State*

*v. Haynes*, 2025 UT App 75, ¶ 72, 571 P.3d 1197, *cert. denied*, 578 P.3d 749 (Utah 2025).

¶68    "To reverse under the cumulative error doctrine, this court must determine that (1) an error occurred, (2) the error, standing alone, has a conceivable potential for harm, and (3) the cumulative effect of all the potentially harmful errors undermines its confidence in the outcome." *Id.* ¶ 73 (cleaned up). "For purposes of this analysis, we assume that each of these errors, standing alone, had a conceivable potential for harm." *Id.* (cleaned up). So, we consider "whether the cumulative effect of" the lack of mens rea definitions and the failure to object to Sister's testimony prejudiced Defendants. *Id.*

¶69    As explained above, when evaluating prejudice under *Strickland*, "we assess counterfactual scenarios." *State v. Forbush*, 2024 UT App 11, ¶ 25, 544 P.3d 1 (cleaned up). "Applying this analysis here, we are not convinced that there is a reasonable probability the result would have been better for [Defendants] if the trial proceeded" without the presumed error in the jury instructions and without Sister's presumably improper testimony. *Haynes*, 2025 UT App 75, ¶ 74 (cleaned up).

¶70    At trial, the jury heard testimony that Defendants were all Norteños members and that the Norteños blamed Manuel for the killings of several prominent Norteños members. The jury heard testimony that Manuel and his family "were target number one" for the Norteños and that the Norteños were seeking "revenge." The jury heard testimony that, days before the two shootings, Saedt texted Mancia that Manuel was seen at a gas station. The jury also heard testimony that Manuel posted a photo on Facebook with the caption "NK"—short for "Norteños Killers"— and that Mancia saved this Facebook post to his phone shortly after it was posted.

¶71 The jury heard testimony that the Raptor drove by the Residence on September 18 and fired multiple shots. The jury also heard expert testimony that the shell casing recovered from the September 18 shooting matched the SIG Sauer recovered after the shooting on September 19. It further heard evidence that on September 19, Defendants fired shots at the Residence or those standing outside of it and then fled, which led to the car accident. The jury heard still more evidence that Defendants were in the Raptor at the time of the accident, that guns were found in and around the Raptor, and that the shooter on September 19 was in the rear seat of the Raptor and was wearing glasses. The jury also heard testimony supporting that all three defendants had firearms: the Desert Eagle had been fired, DNA found on the SIG Sauer matched Saedt's profile, and DNA found on the Taurus matched Alvarez's profile. Finally, the jury heard that a man who lived in the Residence ran to the scene of the accident and yelled, "[W]hat now, bitch? What's up, bitch?" and "I'll catch you on the rebound," suggesting he felt the Defendants got what they deserved for shooting at the Residence.

¶72 In short, the evidence heard by the jury overwhelmingly supports that Defendants intended to go to the Residence to engage in a drive-by shooting. In the face of this evidence, including mens rea definitions and removing Sister's testimony about Pace's and Woodward's character and the impact their deaths had on her does not change the overwhelming evidence of Defendants' guilt. For this reason, the cumulative effect of the assumed errors does not undermine our confidence in the outcome, as there is not a reasonable probability that the results would have been better for Defendants had the presumed errors not occurred. Accordingly, there was no cumulative prejudice.

CONCLUSION

¶73 Defendants' multiple ineffective assistance of counsel claims and their cumulative error argument fail. Accordingly, we affirm each of their convictions.

———————